544 So.2d 556 (1989)
Mary Rose SORRELLS, et al.
v.
EDDIE KNIPPERS & ASSOCIATES, INC., et al.
Nos. 88 CA 0029, 88 CA 0030.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
*557 Phil E. Miley, Baton Rouge, for plaintiff-appellant Mary Rose Sorrells, et al.
Paul H. Jantz, Baton Rouge, for intervenor-appellee Hanover Ins. Co.
Thomas M. Richard, Metairie, for defendant-appellant Penn-America Ins. Co.
Lawrence A. Durant, Baton Rouge, for defendant-appellee State of La., et al.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
These consolidated cases arise from a collision between an automobile and a dump truck pulling a tilt-bed trailer. The collision occurred on September 28, 1983, in East Baton Rouge Parish on Greenwell Springs Road approximately 700 feet from its intersection with Sullivan Road. The accident was fatal to Mary Rose Sorrells' husband, Montie Sorrells (decedent), and her son Patrick was injured. She originally brought suit individually and on behalf of her minor children, Patrick, Michael, Maureen, and Steven, for damages for wrongful death and loss of support. Her major daughter, Kathryn Sorrells, joined in that suit for wrongful death and loss of support. Mary Rose Sorrells brought a separate suit on behalf of her minor son, Patrick, and individually, to recover damages for Patrick's personal injuries. The suits were consolidated for trial.
Defendants were Eddie Knippers & Associates, Inc. (Knippers), its employee and the truck driver, Harry Williams (Williams), its primary liability insurer, United States Fidelity and Guaranty Company (USF & G), and its excess liability carrier, Penn-America Insurance Company. Hanover Insurance Company intervened to recover its payments made under an automobile insurance policy issued to the Sorrells. USF & G was released by plaintiffs before trial, and trial proceeded against Knippers, Penn-America Insurance Company, and Williams.
After a three-day bench trial, the trial court rendered judgment against the remaining defendants and in favor of plaintiffs on liability, finding the decedent to be 0% at fault. The trial court then fixed general damages as follows:
Mary Rose Sorrells for the wrongful death of her husband, $125,000.00;
Kathryn Sorrells, for the wrongful death of her father, $32,000.00;
Patrick J. Sorrells, for the wrongful death of his father, $40,000.00;
Patrick J. Sorrells, for his personal injuries, $5,000.00;[1]
Mary Rose Sorrells for her minor child, Michael Sorrells, $40,000.00, for the wrongful death of his father;
Mary Rose Sorrells for her minor child, Maureen Sorrells, $35,000.00, for the wrongful death of her father;
Mary Rose Sorrells, for her minor child, Steven Sorrells, $35,000.00, for the wrongful death of his father; and *558 in favor of plaintiffs, $300,000.00 for past and future lost wages or support.
Plaintiffs have appealed from the judgment, assigning as error the inadequate amount of general damages and damages for past and future lost wages or support. Penn America has appealed the court's finding of liability against its insured, Knippers, and Williams.
LIABILITY
Decedent was driving a 1982 Nissan Sentra (auto) the morning of the accident, southwest on Greenwell Springs Road toward Baton Rouge.[2] His son, Patrick, was a passenger. He was taking Patrick to school so he could work out with the football team, as he did several mornings a week. Patrick testified he had fallen asleep and only woke up after the collision had occurred.
Williams was driving a 1972 Kenworth twelve-yard dump truck with a tandem semi-trailer for his employer Knippers. He was headed northeast on Greenwell Springs Road, away from Baton Rouge and toward Greenwell Springs. The trailer was empty. Williams' assignment was to get a load of sand and transport it to a job site. Knippers' office was on Greenwell Springs Road, about a mile from the accident site.
Williams testified that the hitch used to connect the trailer to the truck was a military type with a locking mechanism which has a flap hitch with a bolt through it; that the bolt was inserted that morning in the hitch but he did not know who had done it; that he had attached the safety chain himself by running it around the trailer and through the bumper of the truck; and that the other end of the chain was wrapped around the trailer.
Williams testified that he was driving about 35 miles per hour when he heard a crash; that he looked out his side mirrors and did not see his trailer; that he looked back and saw the trailer on the right side of the road, in the ditch, maybe 10 to 15 feet away from the truck; that he heard the crash after passing a "line of cars"; that he never saw the Sorrells auto before the collision; that there was no contact between his truck and the car; that he spoke to nobody at the scene other than the state trooper and Eddie Knippers; that he went to the side of the road to a telephone to call EMS and his office immediately after the accident.
State Trooper Michael Harrell testified that he arrived on the scene at 7:03 a.m.; that the Sorrells auto was on the west side of the road with its rear wheels on the shoulder and the front wheels on the side of the road itself; that the trailer was in the ditch on the east side of the road; that the dump truck was 330 feet north; that there were paint markings on the front left of the trailer, indicating the point of collision between the auto and trailer; that the trailer had the chain attached to it, wrapped around the tongue (sand left on the trailer was not brushed away from it, indicating that the chains were not attached at the time of collision); and that there was no damage to the chain itself. This type of hitch is designed for a bolt to be inserted through the top latch of the hitch to keep its upper jaw from opening. As long as the bolt is inserted completely through the safety latch, the lever will stay down and the hitch will not open. Harrell testified the hitch was open, but the stud part of the bolt was not connected. The bolt was broken off.
From the scuff marks on the highway, caused by the left front tire of the auto as it began its backwards travel, and the debris scattered on the road, Harrell was able to identify the approximate point of impact between vehicles as being four feet over the center line of the highway, in the northeast lane of Williams' travel. The trailer had crossed into the opposite lane and then crossed back again before coming to a rest, according to scraping that Harrell found which he attributed to the trailer tongue. The left front tire of the auto was worn and blown out, but there was no way of telling whether the blowout happened before *559 or after the collision. There was no evidence of any damage to the truck. There were no skid marks indicating a braking action by the auto.
Four other fact witnesses testified at trial. Private Norris Van Thurman actually saw the collision. He was an employee at Kroger's, directly adjacent to Greenwell Springs Road, at the time of the accident and was approximately 40 meters or 120 feet from the point of impact when he looked over because of noise the truck was making. He testified he saw the trailer "coming aloose right as I looked"; that after the trailer became separated from the truck, it traveled some thirty meters "just smooth sailing" before it went into the other lane in a slight curve in the road and hit the auto head on and knocked it off the road; that he ran over to the accident scene immediately afterward and saw the safety chains wrapped around the hitch of the trailer; that there were no chains on the truck; that he asked the driver of the truck if he realized the driver of the auto might not be dead if the safety chains had been hooked up, and that the driver replied that he did realize that.
Claude Prudhomme testified he was following the truck, headed east toward Greenwell Springs, in heavy traffic; that he was maybe 30 feet behind the truck when the trailer dropped "aloose" right in front of him, hit the road, went toward the left, hit the auto and started backing up toward him; that the trailer had to go into the other lane because if it had not done so, there would not have been a collision; that he saw the trailer hit the road and bounce into the car; and that the tongue of the trailer went down. Prudhomme was 67 years old at the time of trial and had worn glasses for several years; he had also suffered from a cataract since he was a child. However, he testified his vision was not impaired. He contradicted Thurman's testimony concerning the "smooth sailing" of the trailer; according to Prudhomme, if it "ran aloose" it was only a very short distance.
James and Glenda Neely were traveling southwest on Greenwell Springs Road about 100 feet from the accident scene, behind the Sorrells auto. James Neely testified that he did not see anything, but his wife Glenda saw the trailer out of control, unattached to anything, and screamed to him to stop. Neely then saw the trailer behind the truck. It veered to his left, then veered all the way across the road and back into the ditch on the other side. Neely at this point was trying to decide where he himself should "hit the ditch." When he heard the crash, the trailer had already moved into his lane of travel. He came to a stop within less than 100 feet from the Sorrells auto.
Glenda Neely testified that she and her husband were traveling west on Greenwell Springs Road[3] when she looked up and saw the trailer about 100 feet from their car, in their lane. She continued watching it; it went to the north side of the road, then back to the south side, stopped on the south side "and then we saw this heap of something." The trailer, when she first saw it, was traveling at an angle, in a northeast direction.
The Neelys were slightly acquainted with the Sorrellses; they lived on the same street and had belonged to the same tennis club several years before the accident.
Scott Laborde was parked in his pickup truck in the Kroger's parking lot the morning of the accident, with his back toward Greenwell Springs Road. He testified that he heard an explosion behind him, looked back through the rear window of the truck, and the accident had already happened; that the auto was some 12 to 15 feet behind him; that he ran toward the scene and saw the trailer coasting down the embankment into the ditch.
Defendants assign as error the trial court's favoring the testimony of witnesses to the accident over the physical evidence. They argue that the physical evidence showed that the trailer and truck were *560 disconnected after the accident, not before, and that since the collision occurred in Williams' lane, decedent is presumed to be at fault. As proof, they cite four different categories of physical evidence: first, no gouge marks were found south of the accident scene, indicating the trailer did not travel free of the truck as its tongue would have left deep marks; second, because of the respective heights of the auto and the trailer, and because the auto's damage began at the left headlight, the two vehicles could not have collided while the trailer was unattached to the truck; third, that damage to the bolt itself indicated it could only have been caused by the collision; and fourth, momentum calculations performed by defendants' expert witness indicated that the auto would either have to be completely stopped for the damage to occur as it did, or it would have to acquire additional energy from the truck, i.e., the truck and trailer must have been hitched at the time of the impact.
We quote from the trial court's excellent reasons for judgment on the issue of liability:
I think it is logical to conclude that since everyone else saw the hazard, Mr. Sorrells saw the hazard. It is logical to conclude and it is more probable than not that one observing a hazard in his lane of travel would respond thereto. It is more probable than not and it is logical to assume that that person will immediately begin to stop.
There are no skid marks which would indicate a stop with such force that a skid began, but I thinkI have to assume that Mr. Sorrells first attempted to stop.
How close Mr. Sorrells was before he first recognized his emergency and what time and what options he had are hard to envision. The [right-hand] shoulder of the road indicates a ditch. The oncoming truck indicates a hazard to his left. Whether a vehicle under those circumstances can be kept under control or not is only subject to speculation.
If I were to accept the defendants' theory, I would have to assume that Mr. Sorrells was attempting to avoid the hazard in front of him by nearly driving into the side of the truck. To pass as close to the rear tire of the truck as postulated by the defendants' expert, Dr. McPhate, would require the driver, if he was under control, to almost aim at the front or the side of the truck that was moving thirty-five miles an hour. What would cause him to do that?
I cannot satisfy the conflicts as to whether the emergency in front of Mr. Sorrellswhich I find as a fact to be more probable than notwas a trailer separated from a truck or a truck itself across the [center line] and zigging and zagging back and forth. I think it's more probable than not it was one of the two, either of which would result in fault on the part of the defendants. If the truck were swerving back and forth, it might account for some of the eyewitness testimony. It would account, I think, for the response of Mr. Sorrells. There simply was no place for him to go.
I am impressed with the defendants' evidence on the question of the bolt in the trailer hitch. I think the evidence clearly indicates that the chain was not on the trailer hitch and the evidence preponderates in favor of a finding that the bolt was not properly placed in the trailer hitch.
. . . .
Therefore, having found that the testimony of the eyewitnesses is that there was an emergency in front of Mr. Sorrells and having found it more probable than not that he responded to that emergency, I now find that he was zero percent at fault in bringing about the collision that occurred, and that Mr. Williams, either because the trailer had come loose or because he had somehow come over into the lane of Mr. Sorrells prior to the accident, for whatever reason I cannot say with certainty whatever the reason was, but I do say that I find that Mr. Sorrells saw an emergency in his path, not of his own creation, that had to be the fault of Mr. Williams and find one hundred percent fault on the defendant, Mr. Williams.
*561 Defendant argues that because the collision occurred in the truck's lane of travel rather than the auto's, there is a presumption of negligence on decedent's part. However, the presumption is rebutted by a showing that the collision was not caused by decedent's negligence, or that there were justifiable circumstances which would excuse his conduct. Davidson v. Curole, 196 So.2d 311 (La.App. 1st. Cir.1967). Plaintiffs proved that the bolt was not properly inserted in the hitch and that the chains were not hooked immediately after the collision. Three witnesses actually driving along Greenwell Springs Road at the time of the collisionJames and Glenda Neely and Claude Prudhommetestified that the trailer was traveling free of the truck. Both Prudhomme and James Neely testified that they were afraid the trailer was going to hit them. Decedent's reasons for driving into the oncoming lane will never be known; it is clear, however, that he was confronted with a sudden emergency and thus the presumption of his negligence has been rebutted by plaintiffs. Defendants argue that because the testimony of the witnesses is irreconcilable, it was incumbent on the trial court to decide the case based on physical evidence. However, the physical evidence defendants submitted was no more conclusive than the eyewitness testimony. We see no reason that the trial court should be required to give more weight to it than to the testimony of eyewitnesses. We cannot say the trial court was clearly wrong in its conclusion that defendants were 100% at fault in causing the accident.
QUANTUM
Plaintiffs appeal from the trial court's damage awards on two different bases: first, that the award of $300,000.00 for past and future lost wages was inadequate; second, that the general damage awards to each surviving member of the Sorrells family were inadequate. We will first address the awards for past and future loss of support.
Plaintiffs argue that the trial court erred in its award for past and future lost wages for three different reasons: first, that the amortization of a license fee and covenant not to compete which decedent entered into when he purchased Marcoin Business Services should have been added back in computing loss of net income; second, that the post-accident performance of decedent's two businesses purchased during 1981, two years before his death, should have been considered by the trial court in making the award; and third, that the trial court relied on post-tax income.[4]
We find no merit to the first issue raised by plaintiffs concerning the amortization. Decedent, when he purchased Marcoin Business Industries, also paid a license fee and entered into a covenant not to compete. These expenses, according to both Dr. Kenneth Boudreaux, defendants' expert economist, and to Dr. Randy Rice, testifying as an expert economist on behalf of plaintiffs, differed from straight depreciation of tangible items such as office furniture. Unlike the latter expenses, the amortization expenses associated with the covenant not to compete and the licensing fee would not be repeated over the life of the business and thus, arguably, should not be deducted as an expense in calculating future loss of income. Dr. Rice added these expenses to arrive at decedent's net income. Dr. Boudreaux testified that he went ahead and gave plaintiffs "the benefit of the doubt" and added back in the amortization figures as shown on decedent's and his wife's joint 1981, 1982, and 1983 tax returns, totaling some $44,658.00. Thus, this argument is without merit.
Secondly, plaintiffs argue that the trial court failed to consider probative evidence concerning the performance of M & S Associates (M & S) and Marcoin Business Industries after decedent's death. Such evidence, plaintiffs argue, is a true indication of what income decedent would have *562 earned and thus should have figured into the trial court's pecuniary damage award.
Bob Moore, who bought out decedent's partnership interest in M & S after decedent's death, testified the client base greatly expanded after decedent's death. At the time of the accident, M & S had one client and since that time, Moore added four. Moore had a background in the health care industry and testified that decedent was the "brains" behind the operation. It is impossible to determine how much of the growth in M & S since its formation in September of 1981 up to the date of trial, in February of 1987, is attributable to Moore's individual efforts. As to Marcoin Business Associates, Frank Ard, who bought the business from decedent's wife after his death, testified that the client base had doubled from the time he went to work for decedent in 1981 until his death. However, there is no evidence in the record that the business, which drew 45% of its clientele from the oil and gas industry, has expanded since decedent's death.
Dr. Rice, testifying for plaintiffs, believed two years was adequate to indicate the potential growth of a company; Dr. Boudreaux believed at least five years of performance data on a company were necessary to establish a pattern. Dr. Boudreaux, accordingly, used an average of decedent's income for the five years before his death, which included salary for two years while he was still employed by Exxon. Decedent worked for Exxon for approximately twenty years before acquiring Marcoin and M & S; at the time he left, his salary was approximately $39,000.00. Decedent's wife testified he left Exxon because he felt he could improve his income by going into business for himself. Considering the uncertainty surrounding any new business venture, we do not believe it was an abuse of discretion for the trial court to rely solely on Dr. Boudreaux's calculations, which incorporated two years of decedent's Exxon salary, in projecting future lost wages.
Lastly, we note that Dr. Boudreaux, who reached a total figure of $299,220.33 for past and future lost wages by taking an average of decedent's income for five years, discounting it by 7.5% and factoring in inflation between 2% and 5%, deducting decedent's personal consumption based on the changes in family consumption as each child reached the age of 21, and multiplied by a work-life expectancy figure of 19.13 years, did in fact rely upon post-tax income in taking the average. Plaintiffs argue that it was an abuse of discretion for the trial court to rely on Dr. Boudreaux's post-tax calculations. We agree. Black v. Ebasco Services, Inc., 411 So.2d 1159 (La. App. 1st Cir.), writ denied, 414 So.2d 1253 (La.1982). However, the tax returns relied upon by both Dr. Rice and Dr. Boudreaux included passive, or unearned, income based upon rents and interest, in addition to decedent's actual earned income. Those amounts are roughly equivalent to the amounts paid by decedent as taxes over the same period of time and thus would offset the tax payments. Thus, Dr. Boudreaux's figures, although based on net rather than gross income, were proportionately inflated by the inclusion of income which was not dependent upon decedent's effort and thus, we must assume, would continue after his death. The trial court's reliance on Dr. Boudreaux's post-tax calculations, therefore, was harmless error under these facts, and we cannot say that it abused its great discretion in fixing plaintiffs' loss of past and future wages at $300,000.00.
Plaintiffs go on to argue that the general damage awards to decedent's wife and the five children were inordinately low and should be increased because they were so low as to constitute an abuse of discretion. We first review generally the testimony concerning the family life of the Sorrells.
Decedent was 43 years old when he died. He and Mary Rose had been married since 1963 and had never been separated. From all accounts, they had a loving and close relationship. Their life centered around their children and their children's activities. They all attended church together; decedent was a eucharistic minister in the Catholic church. He had no hobbies other than those concerning his children's activities, *563 such as scouting (he founded and was the scoutmaster of Patrick's scout troop) and sports activities (he coached his son Steven's Little League baseball team). In fact, the very circumstances of the accident lend support to this picture of family life; decedent was driving his oldest son, Patrick, to football practice. Kathryn, the oldest child, was 18 when her father died; she often consulted with him on problems. Patrick, who was 17 then, testified, "He was more than just my father. He was my dad." Michael was 14 and described his relationship with his father as one of the best he knew of, compared to his friends' relationships with their fathers. Decedent's wife testified that when he got home from work, he helped the younger children with their school work and played with them. Steven was six and Maureen nine at the time of their father's death. We note that the Sorrells' family relationship was an extraordinary one.
The trial court awarded $125,000.00 to decedent's wife for decedent's wrongful death and $32,000.00 to $40,000.00 to each of the children. In Thomas v. State Farm Insurance Company, 499 So.2d 562 (La. App. 2d Cir.1986), writs denied, 501 So.2d 213, 215 (La.1987), the Second Circuit reviewed wrongful death awards and found that the range for awards to a spouse was $7,500.00 to $200,000.00. Awards for minor children ranged from $25,000.00 to $150,000.00; awards for major children ranged from $20,000.00 to $75,000.00. In that case, the court reduced the trial court's award to a surviving spouse from $599,067.00 to $150,000.00, and to two surviving children from $300,000.00 each to $100,000.00 and $75,000.00. Here, the trial court's awards to the five surviving children were: $32,000.00 to Kathryn, a major child, $40,000.00 to Patrick, a major child, $40,000.00 to Michael, a minor child, and $35,000.00 to each of the two youngest children.
The unique facts of each case must be considered when reviewing damage awards. Here, the extraordinary family relationships are clearly evident from the record. Sue Hernandez, a neighbor, testified that decedent was an active participant in his children's life; that he did not help with the scout troophe was the scoutmaster. He was not a helper on the baseball teamhe was the coach. She, along with the other witnesses, described a truly unique human being. The loss sustained by his loved ones, which the record demonstrates, was overwhelming.
We raise the award to his wife from $125,000.00 to $200,000.00. She lost a friend as well as a husband. We raise the award to the oldest child, Kathryn, born June 30, 1964, from $32,000.00 to $75,000.00. Even after she was grown and off to college, she came home to talk over her problems with her father. As she said, "I talked to my dad more than I talked with anybody." We raise the award to the oldest son, Patrick, born November 12, 1966, from $40,000.00 to $80,000.00. He not only lost a father, but, in his words, "a dad," scoutmaster, football coach, and tutor.
We raise the award to Michael, born April 24, 1969, from $40,000.00 to $80,000.00. He lost his baseball and football coach, and in describing his relationship with his father, he said it was "one of the best that I've known of all my friends and their relationships with their fathers."
We raise the awards to the two youngest children, Maureen, born February 14, 1974, and Steven, born March 4, 1977, from $35,000.00 each to $80,000.00 each. The youngest children did not testify, but their mother was able to shed light on their wonderful relationship with their father. Decedent was Steven's Little League baseball coach; he went with his father to his office on Saturdays when they did things together. They colored and played games together. In discussing Maureen, her mother said they were very, very close; she was with him as much as possible.
Plaintiff also testified that family time together depended on the season. On Friday, the family went to football games. On Saturday, they went out to dinner. On Sunday, they attended church. If it was baseball season, they were at the baseball park. It is also significant that, even though the older two children were majors, *564 all the children lived at home on the day of trial.
We recognize that under the appropriate rule of appellate review, i.e., Reck v. Stevens, 373 So.2d 498 (La.1979), we may only raise the awards to the lowest award that a reasonable fact finder could have made. See Mergen v. Piper Aircraft Corp., 524 So.2d 1348 (La.App. 1st Cir.), writs denied, 532 So.2d 154, 155, 156 (La.1988). We have done that and have articulated our reasons for so doing. Accordingly, we affirm the judgment of the trial court, as amended. All costs of this appeal are taxed to defendants.
AFFIRMED, AS AMENDED.
NOTES
[1] Patrick Sorrells was a major at the time of trial and thus the award was made to him individually for his own personal injuries. He did not appeal the $5,000.00 award for his personal damages but did join his mother's and major sister's appeal of general damages in the wrongful death action.
[2] Greenwell Springs Road is often considered as running east/west; however, Officer Harrell testified it is actually northeast/southwest. In this opinion, the orientation used is northeast/southwest.
[3] See footnote 2. Translating Mrs. Neely's directions, they were traveling southwest on Greenwell Springs Road. The "north" side of the road she refers to, therefore, is the side of the road to her left; the "south" side of the road is to her right.
[4] Decedent acquired Marcoin Business Services in May of 1981 and founded M & S Associates in September of 1981. Marcoin was a business management service; M & S Associates was a billing service for doctors and medical institutions. Decedent's position with Exxon prior to his going into business for himself was Marketing Supervisor.