663 So.2d 357 (1995)
Susan B. HOLLINGSWORTH, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, THROUGH DOTD, Defendant-Appellant.
No. 95-285.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1995.
Writ Denied January 12, 1996.
*358 John Wyeth Scott, Alexandria, for Susan B. Hollingsworth, et al.
Ted David Hernandez, Natchitoches, for State of Louisiana Through DOTD.
Before DOUCET, C.J., and YELVERTON and PETERS, JJ.
YELVERTON, Judge.
This appeal is from a judgment awarding damages to Susan Hollingsworth and daughter Christy for the deaths of Jerry Hollingsworth and 10-year-old son Todd. Jerry and Susan had been married but were divorced at the time of the accident, although they still lived together. Christy and Todd were their two children. The trial court found that the deaths of Jerry and Todd were caused by the sole fault of the State of Louisiana, through the Department of Transportation and Development (DOTD).
The accident occurred on November 11, 1990 around 9:00 p.m. at the intersection of US 165 and Business US 165 (Military Road) in Pineville. Jerry and Todd were traveling northbound on Highway 165 on a motorcycle when they collided with Marshall Winn's truck. Winn had been traveling southbound on Highway 165 and was attempting to make a left turn onto Military Road. Todd died immediately and Jerry died at the hospital that night.
Settlement with other defendants left DOTD as the only party remaining at trial. The trial court found that the DOTD was 100% at fault for the accident because there was no traffic light at this intersection, and that a traffic light would have prevented the accident. Damages were awarded to both Susan and Christy. The DOTD appeals the finding that it was 100% at fault for this accident, the award of damages for loss of inheritance, the award for loss of support to Christy, and the award for Jerry's pre-impact fear.
Both Susan and Christy answered the appeal. Christy alleges that the award for loss of inheritance should be increased. In the alternative, Susan and Christy claim that they are entitled to an award for loss of past and future earnings. Christy has also asked for an increase in the loss of support award.

FAULT
The DOTD alleges that the trial court should have found Winn, the truck's driver, negligent. It claims that Winn was the proximate cause of this accident when he made a *359 left turn, failing to see the oncoming Hollingsworth motorcycle.
Cause in fact is a factual question to be determined by the fact finder. A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." In order to reverse a fact finder's determinations of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) a reasonable factual basis does not exist for the finding of the trial court, and (2) the record establishes that the fact finder is clearly wrong or manifestly erroneous. Theriot v. Lasseigne, 93-2661 (La. 7/5/94); 640 So.2d 1305.
A reasonable factual basis exists for the trial court's finding that the negligence of the DOTD in failing to install a traffic signal at this intersection was the cause of the accident. The trial court was not manifestly erroneous or clearly wrong in its finding of fault.
Much evidence was introduced at trial with regard to the installation of a traffic signal at this intersection. Experts for both sides testified, in addition to several witnesses, with regard to the need for a traffic signal light.
This is far from being a typical intersection. There are ten lanes of traffic entering this intersection and seven lanes of traffic exiting. The intersection sits on top of a hill and is in a curve. Military Road enters Highway 165 at a 45° angle as opposed to a 90° angle.
It was revealed that along Highway 165 where this intersection is located there was a long history involved with respect to traffic signals. In January of 1987, the mayor of Pineville forwarded a resolution to the Office of Highways expressing a need for proper signal devices from the Proctor and Gamble Manufacturing Company to the Pineville Expressway which includes the intersection in question. Correspondence from the DOTD indicates that highway reconstruction was scheduled for this area and that it wanted to wait until the project was far enough along to determine what control devices would be needed. The intersection involved was on the two-lane section of Highway 165 which was to be four-laned. On May 28, 1987, Buck Morton, district traffic operations engineer, wrote a letter indicating that a traffic signal would meet the minimum requirements at the questioned intersection but that traffic counts would not be done until construction was completed. Morton wrote another letter on July 12, 1990, explaining that the installation of a traffic signal at this intersection was delayed because construction plans were changed. In this letter he made the recommendation that a signal light be installed at the intersection as soon as possible due to the wide expanse of the intersection and the close proximity of the signals.
There was an attempt to put a traffic signal at this intersection in July 1990. However, the drawing the signal crew had of the intersection did not match the actual intersection. A traffic signal that was scheduled for installation at another intersection on the highway was installed at the same time, but the signal crew was told to hold off on this one because of the discrepancy. This accident happened on November 11. The traffic signal was finally installed in December 1990.
Dr. John Glennon, a civil engineer, was the expert who testified on behalf of the plaintiffs. Dr. Glennon testified that this was a difficult intersection to operate safely and efficiently, especially at night, because of several design elements. Dr. Glennon discussed the difficulties that these design elements caused for a driver. He explained that the intersection is situated on top of a hill and in a curve, Military Road enters the intersection at a 45° angle as opposed to a 90° angle, and it is a very large area. There is also a fence around a pumping station in the median which blocks some of the vision of oncoming cars.
Dr. Glennon explained that a driver making a crossing maneuver is exposed to oncoming cars for a longer period of time so he needs to see the traffic for a greater distance. The sight distance is the distance required by a driver making a maneuver through the intersection to see traffic that conflicts with that maneuver. He calculated that the sight distance for a southbound motorist in the left turning lane is 550 feet. *360 Based on the time of exposure and the speed of oncoming traffic, 825 feet of sight distance is required. With the fence blocking vision, the sight distance is around 400 feet. Based on these conclusions, he found the sight distance at this intersection to be in violation of the standards for intersections published by the American Association of State Highway and Transportation Officials. He concluded that the accident was likely to happen if the motorcycle was between 300 and 825 feet from the intersection. It would be difficult for a driver at the intersection to see a motorcycle in this area.
Dr. Glennon also explained "warrants," a list of reasons to justify a traffic signal. He found that a traffic signal was both "warranted" and needed prior to November 11, 1990, for both movement and traffic safety. Dr. Glennon testified that a traffic signal was needed at this intersection back to 1987. He stated that a traffic control device should have been in place when the intersection was opened after construction. He further explained that if a system protecting a left turn for southbound motorists had been in place, the accident would have never occurred.
Dr. Joseph Blaschke testified as an expert for the DOTD. He admitted that there was some obstruction caused by the fence in the median until the driver moved farther into the intersection. He also admitted that the smallness of a motorcycle made it hard to see at night. He admitted that with a left turn traffic signal there would have been no accident. Dr. Blaschke also agreed that this was a location that should have a traffic signal. He also agreed with Morton's letter in July 1990 that a traffic signal be put up on an expedited basis. However, he was of the opinion that the accident was caused by Winn not seeing the motorcycle. He agreed that Winn never saw the motorcycle because his vision was blocked but stated that once he pulled away from the intersection, he should have seen the motorcycle. However, he explained that Jerry responded 2.5 seconds before impact. This means that once Winn was in the intersection, there was not much time to react.
We affirm the finding of liability.

DAMAGES
Both parties have raised issues on appeal with respect to several of the awards for damages. We will address each award and the issues raised with respect to that award.

Loss of Inheritance
The most serious damage issue is the award for "loss of inheritance." The trial court awarded Christy $66,539 for loss of inheritance of her father's estate. We reverse this award.
The trial court found sufficient evidence noting, in oral reasons for judgment, that this 35-year-old deceased "would have accumulated an estate as was projected by Mr. Duggar." Dr. James Duggar, an economist, testified with respect to Christy's loss of inheritance. In valuing the loss of inheritance, he assumed a normal life expectancy of Jerry, valued his estate, and then placed a present value on it. To value the estate, he used the value of the savings plan from Mobil, where Jerry worked, which he had already contributed to for over five years, and the value of the home owned by Jerry. He assumed Jerry would continue to put 10% into the savings plan and Mobil would continue to contribute 6%. His total value for loss of inheritance was $266,156. There was other evidence introduced at trial relating to these two items. Susan testified that Christy was placed in possession of the house, so Christy actually received the house. Also, the beneficiary named on the savings plan at Mobil was Susan. There was no evidence introduced that Jerry intended to change Susan as his beneficiary. These were the basic facts on which the trial court relied for its loss of inheritance award.
Whether loss of inheritance is a proper element of damage in a wrongful death action under La.Civ.Code art. 2315 has not been addressed by any Louisiana court. In Pennington v. Justiss-Mears Oil Company, 123 So.2d 625 (La.App. 1 Cir.1960), the wife and three young children were denied loss of inheritance damages. The denial was based on a finding that in the circumstances of that case such a loss was speculative. The court did not pass on whether loss of inheritance is or is not recoverable as a matter of law. *361 Likewise, in Parker v. Smith, 147 So.2d 414 (La.App. 2 Cir.1962), treating the concept as "loss of a reasonably anticipated inheritance", the court denied the claim finding that the record was barren of any evidence whatever on which an award of that type could be made. A Federal Court of Appeals decision, Tallentire v. Offshore Logistics, Inc., 754 F.2d 1274 (5th Cir.1985), finding no Louisiana dispositive law, affirmed a rejection of such damages with the observation that on the facts "to determine what portion of [the deceased's] income might have wended its way into assets which would have formed a part of the inheritance of the children would be mere speculation."
Like the other courts before us, we will not go so far as to say that there will never be a case where the evidence is demonstrably clear that a loss of inheritance has been suffered, and so we will not declare that such an award is inappropriate as a matter of law. However, we do not think that the evidence in this case is of such extraordinary circumstances as to give rise to proof that Christy indeed suffered a loss of inheritance. The word "speculation" means an assumption not based on demonstrable evidence. Webster's Ninth New Collegiate Dictionary 1133 (1988). The evidence in this case regarding a 35-year-old man and his young daughter shows that there are too many uncertainties and too many variables to remove the speculative nature of such a loss. Had he lived, Jerry's death by natural causes might have been decades away; he might have married again, had more children, or died penniless. There is a vast difference between an award for loss of child support and loss of inheritance. Loss of support is awarded because there is a commandment of law creating an alimentary obligation for the care of children. La. Civ.Code arts. 227, 229, and 230. These obligations are family based, and traditionally they are regarded as natural obligations as well as legal ones. The alimentary obligation is, for the most part, still honored in our society, and it is right and proper that we regard the loss of support as not being of such a speculative nature as to be unenforceable. On the other hand, there is no obligation for a parent to leave an estate at his or her death, nor is there an obligation to leave all of it to any child, under the current forced heirship laws. (Judging from the current swell of opposition to forced heirship, there may soon not even be an obligation to leave any part of whatever estate there might be to any child.) We do not look at the right of inheritance with the same eye that we look at support. We find in this case that the evidence does not support an award for loss of inheritance.

Loss of Earnings
In the alternative, Susan and Christy claim they are entitled to an award for loss of future earnings. As we will discuss later in this opinion, Christy was awarded an amount for loss of support due to her father's death. However, loss of earnings is part of the survival action as damages sustained by Jerry up to the moment of his death. Strawder v. Zapata Haynie Corp., 94-453 and 94-454 (La.App. 3 Cir. 11/2/94); 649 So.2d 554. Therefore, Christy is the only proper person to raise this claim as Jerry's sole heir of his survival action. Susan, divorced from Jerry, does not belong to any class of beneficiaries and has no right for any survival action on behalf of Jerry. La. Civ.Code art. 2315.1.
In this case Jerry did not survive long enough between the time of his accident and his death to have suffered any loss of earnings. See Newsom v. State, DOTD, 93-815 (La.App. 3 Cir. 3/30/94); 640 So.2d 374, writ denied, 94-1118 (La. 6/24/94); 641 So.2d 207. Therefore, it was proper not to award an amount for Jerry's loss of earnings.

Loss of Support
The DOTD alleges that the trial court erred in its award of loss of support by using $750 a month as the basis of support using the child support guidelines, when there was, in fact, a judgment in place ordering Jerry to pay only $200 a month child support. It also alleges that the trial court erred in awarding damages for loss of support past her eighteenth birthday for an additional four years plus college tuition. Christy claims that the award for loss of support should be increased.
*362 We first note that the trial court could make an award to Christy for loss of support past age 18 provided that there is evidence that she would have been supported. Newsom, 93-815 at 10; 640 So.2d at 381. Also, if Christy proved that her father supported her more than just $200 per month as required by the child support judgment, then she is entitled to recover more as the actual loss of support sustained.
Jerry and Susan had a unique relationship in that they got divorced but continued to live together with their children. Christy testified that both her parents supported her. Her father would give her money whenever she needed it for something. Susan testified that she and Jerry ignored the child support provision (just as they apparently ignored the divorce itself) for the six years after they got divorced until his death. She testified that both she and Jerry wanted their children to go to college and would make sacrifices if they had to. Christy also explained that she and her father had discussed her plans for college and he supported her decision. He said he would help her financially. At the time of her father's death, Christy was 16-years-old. At the time of trial, Christy was going to college.
The evidence clearly indicates that Jerry supported his daughter more than he was required to do by the child support judgment and intended to support her through college. This evidence was not contradicted. It was not error for the trial court to award Christy a higher amount as loss of support than required by the child support judgment and continue it through four years of college.
Christy claims that the award for loss of support should be increased to $79,877 for loss of support through age 18 and an additional $135,460 for college costs and tuition for a total loss of support of $215,337. The trial court awarded $70,597 for loss of support which included college costs.
The basis for the trial court's award was Dr. Duggar's calculations. He was the only economist to testify. He found that the loss of support until Christy was 18-years-old would be $79,877. However, this was a loss of support to the family unit. He calculated just Christy's loss of support through college as $60,572. This would leave $10,025 for college expenses. The trial court did not abuse its discretion in the amount awarded to Christy for loss of support.

Damages for Pre-impact Fear
The trial court found that Jerry suffered damages in the amount of $20,000 for pre-impact fear. The DOTD claims the award for Jerry's pre-impact fear was excessive. It cites other cases in which the awards were much lower.
The role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Only after an appellate court determines that the trial court clearly abused its discretion in awarding damages to the injured party in a personal injury case, may the appellate court resort to looking at prior awards in cases with generically similar injuries for the purpose of determining the highest or lowest point at which damages are reasonable. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
The trial court pointed out that Jerry knew the accident was going to happen. He took evasive action by trying to stop and laying the bike down in a last ditch effort to lessen the impact. The trial court believed Jerry understood the danger of the tragedy and was aware of his child also being in danger. The trial court stated that it was aware that the highest award for pre-impact fear was $7,500 but felt this particular case warranted a higher award.
We cannot say the trial court abused its discretion in awarding $20,000 for Jerry's pre-impact fear. The trial court obviously knew other awards were lower but felt that the circumstances of this case warranted more money.
For these reasons the award to Christy Hollingsworth for loss of inheritance is reversed. In all other aspects the award is *363 affirmed. Costs of this appeal are assessed half to the plaintiffs and half to the DOTD.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.