JjAMY, Judge.
This appeal arises from an automobile accident at the corner of MaeArthur Street and Elliott Street in Alexandria, Louisiana. The issues on appeal are whether the jury abused its discretion in: (1) the assessment of general damages to the plaintiff and (2) faffing to award plaintiff future medical expenses. For the reasons which follow, we affirm.
DISCUSSION OF THE RECORD
On April 18, 1995, at approximately 3:15 p.m., plaintiff, Clyde Peterson, who was sixty-six years old, was traveling on MaeArthur Street in Alexandria, Louisiana in his 1985 Nissan four-door Sentra. Geraldine Williams was a guest passenger in the front seat. At about the same time, defendant, Maurice D. Lowery, who was driving a school bus, was also traveling on MaeArthur Street behind Peterson. When Peterson approached the traffic light at the corner of MaeArthur Street and Elliott Street, Peterson proceeded to stop his vehicle because the traffic light had turned red. An accident occurred at the corner of MaeArthur Street and Elliot Street when Lowery struck the rear end of Peterson’s vehicle.
\zOn June 8, 1995, Peterson filed suit against Lowery and his automobile liability insurer, Corgegis Insurance Company. The defendants answered Peterson’s suit and denied liability. A trial on the merits was held before a jury on November 14 and 15, 1995. The jury found that Peterson was 40% at fault for the accident and that Lowery was 60% at fault. The jury also found that Peterson suffered injuries as a result from the accident. The jury awarded Peterson $3,000.00 for past and future physical pain and suffering; $10,746.50 for past medical expenses; and $3,000.00 in special damages. The jury’s total damage award to Peterson was $16,746.50. However, the jury did not award Peterson past and future mental pain and suffering and future medical expenses.
On November 20, 1995, the trial court signed the judgment encompassing the jury’s damage awards. Additionally, in that judgment, the trial court assessed the costs of the trial to the defendants. In response, Peterson filed a Motion Notwithstanding The Verdict, and, in the alternative, a Motion For New Trial. After a hearing, the trial court denied Peterson’s motions.
Peterson appeals and asserts that the jury erred in (1) awarding a low amount of damages for past and future physical pain and suffering and for awarding no damages for past and future mental pain and suffering; and (2) failing to award damages for future medical expenses.
LAW
GENERAL DAMAGES
In his first assignment of error, Peterson argues that the jury abused its discre *961 tion in awarding a low amount of damages for past and future physical pain and suffering and in failing to award any damages for past and future mental pain and suffering. Peterson requests that this court specifically look at each of these elements jgof general damages, alone, to determine if the jury abused its discretion. However, while awards for certain elements of damages may be inadequate or excessive, if the total sum awarded for the general damages is neither inadequate nor excessive, the appellate court cannot disturb that award. James v. Webb, 94-162 (La.App. 3 Cir. 10/5/94); 643 So.2d 424, writ denied, 94-2670 (La.12/16/94); 648 So .2d 396, citing Pitre v. Government Employees Ins. Co., 596 So.2d 256 (La.App. 3 Cir.), writ denied, 600 So.2d 685 (La.1992). The jury awarded Peterson a total sum of $3,000.00 in general damages. Accordingly, for the purposes of our review, we will analyze whether the jury abused its discretion in awarding Peterson $3,000.00 in general damages for his injuries.
“In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” La.Civ.Code art. 2324.1. The initial inquiry by the appellate court in reviewing the judge’s or jury’s assessment of general damages is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person was a clear abuse of discretion. Boudreaux v. Blank, 95-547 (La.App. 3 Cir. 11/2/95); 664 So.2d 705. The Louisiana Supreme Court has specifically held that the discretion in the trier of fact is “great” and “even vast” so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993). An appellate court can only find that the judge or jury clearly abused its great discretion when the general damage award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury under the particular circumstances to the particular plaintiff. Id. Only after such a determination of a clear abuse of discretion is found by the appellate court is the resort to prior awards for similar injuries appropriate. Reck v. Stevens, 373 So.2d 498 (La.1979); Hollingsworth v. State Through Dept. Of Transp. And Development, 95-285 (La.App. 3 Cir. 10/4/95); 663 So.2d 357, writ denied, 95-2674 (La.1/12/96); 666 So.2d 322. At that point, the appellate court will only disturb the general damage award by: (1) lowering it to the highest point that was within the discretion of the trier of fact or (2) raising the award to the lowest point that was within the discretion of the trier of fact. Theriot v. Allstate Insurance Company, 625 So.2d 1337 (La.1993).
Clyde Peterson testified that, on April 18, 1995, at approximately 3:15 p.m., he was traveling on MaeArthur Street in Alexandria, Louisiana in his 1985 Nissan four door Sen-tra. Peterson stated that Geraldine Williams was a guest passenger in the front seat. Peterson testified that when he approached the traffic light at the corner of MaeArthur Street and Elliott Street, the light turned from green to yellow. He further testified that, at that point, he opined that he could not make that traffic light so he began to apply his breaks. He indicated that the traffic light soon turned red and that he came to a complete stop. Peterson said that he was at a complete stop for about ten seconds when the school bus that Lowery was operating struck his vehicle in the rear. He described the impact of the collision as a “great hit” and that the impact caused him to move forward. He also stated that the force of the impact caused his left knee to hit underneath the dashboard. Peterson then noted that, at impact, the radio in his car came out of the dashboard.
After the accident, Peterson testified that he drove his vehicle to St. Frances Cabrini Hospital and went to the emergency room. He stated that he was suffering pain in his neck, low back, and left knee. Peterson acknowledged that in February 1986, he had undergone an operation to place a prosthesis device in both of his knees. However, Peterson continued, he had not had any problems with his knees since the | ssurgery. Further, he stated that he had never suffered from pain in his neck or lower back prior to the accident. Peterson testified that he went to see Dr. Robert K. Rush a few days after the accident. He further testified that Dr. Rush *962 recommended physical therapy for his injures. He stated that he went to physical therapy for a while, but that he “didn’t keep up with it.” Peterson then stated that he went to see Dr. Louis Blanda for his continued pain in his neck, lower back, and left knee.
At trial, Peterson testified that he was still suffering from severe pain in his left knee. When asked how the accident affected his physical activities, the following colloquy took place:
Q. Okay, go ahead, is there anything that you can’t do now after the accident, that you could do prior to this accident?
A. Well, it is a lot that I can’t do now that I was doing before I was in the wreck.
Q. And what is that, Clyde.
A. Like mowing my yard, weedeat it and cleaning up around the yard and my house. I could to a lot before that, but since the accident, it’s poorly.
Q. Did you enjoy doing that type of work, [sic]
A. Oh, yes sir, I enjoyed it.
Q. Are you able to get out of your house during the day since this accident?
A. Well, I can set back on the porch, and uh, go out there and look at my mower, and that’s about as far as I get.
Peterson admitted that, prior to the accident, he was an insulin dependent diabetic; that he sometimes suffered from gout; and that he suffered from “longstanding arthritis.” Finally, Peterson testified that incurred medical bills, up to the date of trial, of $10,764.50.
lePeterson testified that his vehicle sustained damaged in the rear and that impact smashed his rear tail lights. Peterson then stated that he had to obtain a rental vehicle from Agency Rent-A-Car for approximately twenty-seven days because his Nissan Sentra was “not capable to drive on the road with no tail lights or nothing on it, it would violate the law.” He noted that the insurance adjuster for Corgegis Insurance Company offered him $430.00 to repair the damage to the rear of his Sentra. However, Peterson stated that he refused that offer.
Geraldine Williams testified that she was a passenger in Peterson’s Sentra on the day of the accident. She stated that Peterson had come to a complete stop at the traffic light on the corner of MacArthur Street and Elliott Street because the light was red. She further stated that Peterson was stopped at the red light for about ten seconds when Lowery’s school bus struck the rear of Peterson’s automobile. Williams testified that the force of the impact caused her to move forward and that the radio came out of the dashboard. She admitted that she was “slightly injured” but that the “biggest problem” from the accident was her blood pressure. She also noted that she was taken by an ambulance to St. Frances Cabrini Hospital after the accident. Williams testified that Peterson informed her after the accident that he was “stiff’ and that his left knee was hurting. She also observed that Peterson was limping after the accident. Finally, Williams acknowledged that she has filed suit against Lowery and his insurer as a result of this accident.
Maurice Lowery testified that he was employed by the Rapides Parish School Board as a bus driver. He stated that he had a CDL license to drive a school bus. Lowery testified that, on the day of the accident, he had about twenty children riding on his bus. He further testified that he was traveling on MacArthur Street at about 3:15 p.m. when he approached the intersection with Elliott Street. Lowery noted that 17the traffic light turned yellow and that the vehicle in front of him (Peterson) began to slow down. However, Lowery testified that the vehicle then speeded up to make it through the yellow light. But, he stated the vehicle suddenly stopped and, at that point, he struck the rear of the vehicle. Lowery opined that he was traveling at approximately 15 m.p.h. when he struck Peterson’s Sentra. He further opined that the impact moved Peterson’s automobile about one foot.
Alan E. McBride testified that he was employed by the Alexandria City Police Department and that he investigated traffic accidents. McBride stated that he received a call to go to an accident scene on April 18, 1995, at the corner of MacArthur Street and *963 Elliott Street. He then stated that he arrived at the accident scene at 3:25 p.m. and saw that a sixty passenger school bus had rear-ended a 1985 four-door Nissan Sentra. McBride testified that he observed no skid marks and that he took no photographs because it was a “minor accident.” He noted that he saw some “minor damage” to the rear of Peterson’s vehicle. But, McBride testified that he did not observe any damage to the front of Lowery’s school bus.
Dr. Robert K. Rush, who is an occupational physician, testified that he first saw Peterson on April 21, 1995. Dr. Rush stated that Peterson was complaining of pain in his neck, lower back, and left knee. Dr. Rush then stated that he reviewed the x-rays and reports from St. Frances Cabrini Hospital. Dr. Rush testified that, in the lumbar x-ray, Peterson had osteophyte formation up and down his spine and that he had facet hypertrophy at several levels on his spine. Dr. Rush also stated that the chest x-ray revealed that Peterson was suffering from degenerative spurring in the thoracic spine. After reviewing the x-rays, Dr. Rush concluded that Peterson had a arthritic degenerative spine. Dr. Rush then examined Peterson’s left knee and concluded .that it was “tender” and “swollen.” Dr. Rush diagnosed Peterson with a Rcervical and lumbar strain with trauma to the left knee. Dr. Rush noted that he did not put “any limitations” on Peterson. When Dr. Rush was asked what he prescribed, he replied:
We initiated a regiment [sic] of physical therapy, and had him continue the medications that he currently was on, which was a long list including Naprosyn, Predni-sone, Lasix, Cardizem, Prylozec, Zantec, Lanoxin, etc.' He had hypertension, arthritis, gout, and diabetes, and was under the care of Freedman Clinic.
Dr. Rush testified that he saw Peterson again on April 28, 1995, and that Peterson was complaining of pain in his left lower leg, right ankle, neck, and lower back. Dr. Rush also observed that Peterson had undergone a bilateral knee replacement in 1986. Dr. Rush stated that when he saw Peterson on May 12, 1995, Peterson was complaining of pain in his left leg, neck, and lower back. Dr. Rush testified that he ordered an x-ray of Peterson’s knee because he had a “swollen and warm left knee.” When asked if Peterson’s arthritic spine could have been aggravated by the rear end collision, Dr. Rush responded:
The pre-existing long standing degenerative joint disease might have been aggravated by the trauma. 'Where it would come into play would be the possibility of the prolonged recovery.
Dr. Rush testified that he last saw Peterson on May 19, 1995, and that Peterson was complaining of pain in his neck, lower back, and left knee. But, Dr. Rush continued, Peterson’s left knee appeared “to be more of an acute problem that was taking most of the attention.” Also, Dr. Rush explained that the left knee was Peterson’s “main source of complaint.” Dr. Rush also testified that all of his medical treatment he gave to Peterson was related to the accident. Finally, when Dr. Rush was asked about his diagnosis on Peterson’s last visit, the following exchange took place:
|9Q. Doctor Rush, the opinion that you’ve stated today is that he had a long standing pre-existing degenerative joint disease, is that correct?
A. That’s correct.
Q. We’re talking about arthritis, right?
A. Degenerative joint disease/arthritis.
Q. And you stated that that might have been aggravated by the trauma that he sustained in the April 19th accident. Is that correct?
A. That’s correct.
Q. And that the main thrust or consequence of this accident and the trauma that he sustained was a prolonged recovery, is that correct?
A. Well when asked how that would impact, what we’re talking about here, I theoretically said that a prolonged recovery with somebody with degenerative joint disease in the entire spine would be anticipated after receiving such trauma as was received in this accident. I did not treat him for a prolonged period, so I cannot com *964 ment other than hypothetically in relation to that question.
Q. Does your diagnosis remain as of the last time that you saw him, cervical and lumbar strain?
A. Degenerative joint disease, and trauma to the left knee.
Dr. Louis C. Blanda, an orthopedic surgeon, testified that he first saw Peterson on May 4, 1995, and that Peterson was complaining of pain in his neck, lower back, and left knee. Dr. Blanda then stated that he performed a physical examination of Peterson. Dr. Blanda noted that Peterson had “some local tenderness over the sternocleido-mastoid muscles.” But, Dr. Blanda noted that he could not find any masses or spasm in Peterson’s neck. Dr. Blanda stated that the Spurling’s compression caused Peterson some pain at the base of his neck; however, there was no referred pain down his arm that would indicate a nerve compression. Regarding the lower back, Dr. Blanda stated that Peterson suffered no pain during the straight | ípleg raising test. Dr. Blanda testified that he observed the scars on Peterson’s left knee from the previous surgery in 1986. Dr. Blanda noted that Peterson had a “good range of motion” in his left knee but that there was some swelling.
Dr. Blanda testified that he ordered some x-rays performed on Peterson’s neck, lower back, and left knee. Regarding Peterson’s neck and back, Dr. Blanda stated that the x-rays revealed that Peterson had “multilevel arthritic degenerative disc disease” and that there was “some spontaneous fusion areas in the cervical spine because of arthritic disease.” Dr. Blanda further testified that the x-rays on Peterson’s left knee indicated that the “prosthetic part seemed to be in satisfactory alignment and position.” Dr. Blanda, at that point, recommended physical therapy.
Dr. Blanda testified that he saw Peterson again on June 1,1995, and that Peterson was still complaining of pain in his neck, lower back, and left knee. Dr. Blanda prescribed some pain medication and ordered some bone scans to be performed by Dr. Jeffery J. Laborde.
Dr. Blanda stated that, when Peterson came for a visit on July 13, 1995, he was still complaining of pain in the same areas. At that point, Dr. Blanda explained the results from Dr. Laborde’s bone scans:
The CT scan and the lumbar spine showed considerable degenerative osteoar-thritie changes and some stenosis, which is a narrowing or a tightening of the spinal canal, particularly at the LA-5 level. And in the neck area, he had rather diffuse osteoarthritis, again with some bony steno-sis of the nerve tunnels called the foramen.
The bone scan I think was significant in that it showed increased uptake in the lower part of the total knee prosthesis. This is something we see in cases where there is a prosthetic loosening. So there was some suggestion that the lower part of the prothesis, that being in the tibia, might be loose and causing pain.
Dr. Blanda recommended that Peterson continue with the physical therapy and pain medication.
I nDr. Blanda testified that he saw Peterson on September 7, 1995, and that Peterson’s symptoms were “consistent with spinal stenosis.” Dr. Blanda also administered to Peterson an epidural steroid injection which Dr. Blanda explained was a “good way to treat spinal stenosis.” Dr. Blanda observed that Peterson’s left knee was “doing better” and that his knee had a “fairly good range of motion and some mild tenderness.”
Dr. Blanda testified that he saw Peterson on October 3, 1995, and that Peterson was still suffering from pain. Dr. Blanda then suggested a myelogram, which was performed on October 27, 1995. When Dr. Blanda was asked to review the results, he replied:
Pertinent findings on the myelogram were that he did have spinal stenosis at LA-5 and L5-S1. It was primarily due to the arthritis. It was an acquired type of spinal stenosis. I did not see a herniated disc. And similar changes were in the neck, but not as a bad as a the low back where he had osteoarthritis at multiple levels, particularly C5-6 and C6-7.
He said his knee was still giving him problems. We talked about different options of *965 treatment, including the option of doing a revision knee replacement. He said he felt he was too old to go through any major surgery. And I reassured him that the condition he had was certainly not life-threatening and not an emergency and would be an elective type operation if he felt that his symptoms were bad enough. So we pretty much agreed that surgery would kind of be put on a back burner unless things got worse and I would continue to treat him conservatively. And he was to come back and see me in about three or four months.
Dr. Blanda testified that he last saw Peterson on October 31, 1995. Dr. Blanda also opined that trauma could cause an aggravation of Peterson’s spinal stenosis. But, he noted, there was “some question about his knee.” When asked about the bone scan on Peterson’s left knee, the following colloquy took place:
Q. Okay, if the bone — well, the CT scan that was one on June 22nd of 1995 of the knee, I believe by Dr. Laborde— Dr. Laborde’s report that I saw says that there was considerable osteoporosis and bone resorption in the proximal tibial plateau. That would be | i2the area of the — one of the bones in his calf, right, where the prosthesis would have been attached?
A. Yes, that was on the bone scan, correct.
* * * *
Q. And could you tell us what osteoporosis is?
A. Osteoporosis is demineralization, kind of a decalcifieation or a softening of the bone, so to speak.
Q. And that’s a condition that is, if not common, certainly not unheard of in 66-year-old individuals; is it not?
A. No, it is common ...
* * * *
Q. Can the osteoporosis and the bone resorption be related to the prosthesis itself?
Yes, that’s what I was concerned about, that maybe the prosthesis— There are several different reasons why this could happen. It could be loose. It could be infected with a low grade infection. It would be important to, I think, see any x-rays from the surgeon who did his joint replacement and perhaps look at the records, too, as to whether or not he was having any problems with his knee before this injury. A.
* * * *
Q. And so can you rule out with any medical certainty that the loosening and the bone resorption and the osteoporosis is not related to the prosthesis itself as opposed to this automobile accident?
A. Well, that’s the big issue. I can’t tell you for sure that it’s directly related to this auto accident. All I can say is that the bone scan findings are suspicious for loosening of the prosthesis. Now, whether this was present before or subsequent to this accident, we really can’t say. That’s why I would say the other doctor’s records would be important.
At this point, we note that the jury did not award Peterson future medical expenses for the proposed surgery on his left knee. We find that, given the medical evidence presented, the jury could have reasonably found that the loosening of the | igprosthesis in Peterson’s left knee was not caused by the accident, but was caused by Peterson’s pre-existing osteoporosis and bone resorption. This is a crucial finding of fact which we conclude is not manifestly erroneous. By finding that Peterson suffered a lumbar and cervical strain and trauma to his left knee, we examine the general damage award in light of and in deference to this finding of fact. See e.g., Este’ v. State Farm Insurance Companies, 96-99 (La.App. 3 Cir. 7/10/96); 676 So.2d 850.
After a thorough review of the record, we cannot conclude that the jury clearly abused its vast discretion in awarding Peterson $3,000.00 in general damages for the partieu- *966 lar effects of his particular injuries. Therefore, we ñnd that this assignment of error is without merit.
FUTURE MEDICAL EXPENSES
Peterson argues that the jury abused its discretion in failing to award him future medical expenses. Peterson asserts that the medical testimony in the record reveals that he will need future surgery to correct the prosthetic device in his left knee.
Defendants, on the other hand, argue that Dr. Blanda “refused to say with any medical certainty that Mr. Peterson would need surgery in the future.” Further, defendants contend that Dr. Blanda refused to state that the loosening of the prosthetic device was caused by the automobile accident. Accordingly, defendants assert that Peterson has failed to prove by a preponderance of the evidence that future medical expenses for that surgery will be incurred.
As previously stated, the jury’s factual finding with regard to the loosening of the prosthesis was reasonable based upon the ■ evidence presented and was neither manifestly erroneous or clearly wrong. Therefore, we cannot conclude that the jury abused its discretion in failing to award Peterson future medical expenses.
luDECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the plaintiff-appellant, Clyde Peterson.
AFFIRMED.
SAUNDERS, J., dissents and assigns reasons.