37 So.3d 427 (2010)
Michelle ILES and Stephanie Iles
v.
Roger OGDEN, II, Liberty Mutual Insurance Company, Chubb Insurance Company and State Farm Mutual Automobile Insurance Company.
No. 2009-CA-0820.
Court of Appeal of Louisiana, Fourth Circuit.
February 26, 2010.
Opinion on Rehearing March 31, 2010.
*431 David F. Bienvenu, James A. Burton, Shannon H. Huber, Simon Peragine Smith & Redfearn, LLP, New Orleans, LA, for American Alternative Insurance Corporation.
Patrick G. Kehoe, Jr., Patrick G. Kehoe, Jr., APLC, New Orleans, LA, and Fredric G. Levin, Virginia M. Buchanan, Levin Papantonio Thomas Mitchell Echsner & Proctor, P.A., Pensacola, FL, for Plaintiff, Michelle Iles.
James D. "Buddy" Caldwell, Attorney General, Thomas A. McGaw, Assistant Attorney General, Sharry R. Scott, Assistant Attorney General, Louisiana Department of Justice, Litigation Department, New Orleans, LA, for Roger Ogden, II and the State of Louisiana Through the Louisiana State University Health Sciences Center.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
On 30 April 2004, the plaintiff, Michelle Iles,[1] and her husband, Carl E. Muckley, were involved in an automobile accident on I-10 westbound in Ascension Parish as they were traveling to Houston, Texas. Ms. Iles was a guest passenger in the vehicle. The accident occurred when a vehicle driven by the defendant, Roger H. Ogden, II, M.D., left the road while traveling east on I-10, crossed the median, and collided with Mr. Muckley's vehicle. Dr. Ogden, an orthopedic surgeon and employee of LSU Health Sciences Center ("LSUHSC"), was in route from surgery in Baton Rouge to a lecture in New Orleans. Prior to trial, LSUHSC admitted that Dr. Ogden was in the course and scope of his employment at the time of the accident; thus, LSUHSC's liability was established.
Mr. Muckley, born 17 July 1951, died at the scene of the accident. Ms. Iles suffered extensive injuries: (1) a severe traumatic brain injury ("TBI"), with diffuse shearing of the brain; (2) bleeding in the skull; (3) multiple displaced fractures of the left eye orbit, severed acanthus tendon, and cranial nerve injury, requiring two surgeries, resulting in permanent asymmetry of her face; (4) collapsed lung and bilateral contused lungs: (5) lacerated spleen; (6) impaired airway; (7) fracture of her left finger requiring two surgeries; (8) rib fractures; (9) substantial blood loss; (10) lacerations and contusions, including one to the face that was repaired in the hospital; and (11) injuries to her neck and back.
All parties have appealed the judgment of the trial court. The defendants/appellants/cross appellees, American Alternative Insurance Company, Dr. Ogden, and LSUHSC (hereinafter collectively called "the defendants"), contend that the trial court erred by awarding excessive amounts relating to loss of income for the following:
1. $20 million for future loss of support;
2. $2,950,947.00 for past loss of support;
3. $453,325.00 for past attendant care; and
4. $3,943,971.00 for future attendant care.
In addition, the defendants/appellants/cross appellees, Dr. Ogden and LSUHSC, assign as error the failure of *432 the trial court to deduct $400,000.00 from the damage award due to the plaintiff's failure to assert a claim for her marital portion pursuant to La. C.C. art. 2432.
The plaintiff/appellee/cross appellant has appealed, alleging that the trial court erred when it deducted a prior payment of almost $2.4 million dollars from the principal amount of the judgment and not first applying that sum to the pre-judgment interest accruing since the suit was filed.[2]
In our review of this case, we find that we are required to determine whether a cause of action for loss of inheritance and/or a cause of action exists in favor of Ms. Iles for the loss of support from unearned or passive income.[3] In this case, Mr. Muckley and Ms. Iles were living primarily on unearned income consisting of dividends and interest on equities and bonds produced by Mr. Muckley's separate property of approximately $5.4 million dollars, and without any significant amount of earned income.[4] These issues are res nova; no Louisiana cases on point exist.
For the reasons below, we amend the judgment in part, affirm the judgment in part, and render.

1. ATTENDANT CARE
We first address the amounts awarded by the trial court for past and future attendant care for Ms. Iles. It is undisputed Ms. Iles' impairments are severe and permanent. She suffers from double vision, left-sided numbness, pain, and weakness. She has impaired motor function ability and coordination that cause her difficulty with self-care tasks, such as bathing, dressing, fixing her hair, and putting on and tying her shoes. She also has difficulty with standing, bending, twisting, kneeling, stooping, and climbing, often needing assistance when walking. She has problems with expressive and receptive language skills, paying attention and following directions, impaired concentration, and exercising judgment. The parties agree that Ms. Iles needs attendant care; the issue is the amount of care required.

(A.) Past Attendant Care
The trial court awarded $453,325.00 for past attendant care. In its reasons for judgment, the court did not specify the hourly wage it used for the calculation. However, in the plaintiff's post-trial memorandum, she suggested using $12.50 per hour to reach the amount actually awarded by the court. The defendants argue that the amount is not supported by the record and, therefore, excessive, but they suggest no specific amount. For the reasons that follow, we are required to agree with the defendants.
It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. La. C.C. art. 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment *433 of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. Wainwright v. Fontenot, 00-0492. p. 6 (La.10/17/00), 774 So.2d 70, 74. "One injured through the fault of another is entitled to full indemnification for damages caused thereby." State Farm Mut. Auto. Ins. Co. v. Berthelot, 98-1011, p. 7 (La.4/13/99), 732 So.2d 1230, 1234. "[A] defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991). The Supreme Court has noted:
The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440, p. 10 (La.3/23/01), 782 So.2d 606, 612-13 (quoting Canter v. Koehring, 283 So.2d 716, 724 (La. 1973)) (superseded by statute on other grounds). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
Special damages are those which have a "ready market value," such that the amount of damages theoretically may be determined or calculated with relative certainty, such as medical expenses and past lost wages. Kaiser v. Hardin, 06-2092, p. 11 (La.4/11/07), 953 So.2d 802, 810 (per curiam) (citing McGee v. AC and S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770). On the other hand, general damages have been defined as those "which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money." McGee, 05-1036 at pp. 3-4, 933 So.2d at 774.
An appellate court, in reviewing a judge's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Kaiser, 06-2092 at p. 11-12, 953 So.2d at 810 (citing Guillory v. Ins. Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029). The discretion of the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Greenhead Gun Club, L.L.C. v. City of Shreveport, 40,045, p. 14 (La. App. 2 Cir. 10/12/05), 914 So.2d 62, 71.
Gail Adams, the plaintiff's only witness on this issue, testified that she was paid $10.00 per hour to care for Ms. Iles.[5] She cared for Ms. Iles from December 2004 to June 2005. Her testimony is uncontested. Because we are addressing past attendant care, we cannot award the plaintiff more than was actually paid. Thus, the trial court was manifestly in error and clearly wrong in using an hourly wage of $12.50.
The record on appeal does not indicate that Ms. Iles received 24-hour attendant care from Ms. Adams from the time she *434 was released from the hospital until trial. By implication and extrapolation, her family cared for her when Ms. Adams did no longer. The record before us contains no evidence that any member of Ms. Iles' family was either compensated or promised compensation for their efforts. Such does not, however, mean that they could not state a cause of action for compensation. We recognize that courts do award such sums for the services of family members in the absence of hard evidence on the point. We expressed this in Kelty v. Brumfield, 96-0869, pp. 6-7 (La.App. 4 Cir. 3/12/97), 691 So.2d 242, 247, citing Edwards v. St. Francis Med. Center, 623 So.2d 1387 (La.App. 2d Cir.1993) by stating, "In order for a non-professional parent to make a claim for nursing services rendered, there must be a showing that there is a need for the services, the reasonableness of the fee must be established, and the extent and the duration must be proven." Our colleagues on the First Circuit in Tanner v. Fireman's Fund Ins. Cos., 589 So.2d 507, 515-16 (La.App. 1st Cir.1992), citing Bordelon v. Aetna Cas. & Sur. Co., 494 So.2d 1283 (La.App. 2d Cir. 1986), explained the law as follows:
"The fact that medical attention and nursing have been rendered gratuitously will not preclude the injured party from recovering the value of such services".... We hold, however, that a claim for sitting expenses rendered gratuitously by nonprofessional family members without a doctor's orders must be viewed with close scrutiny. The need for services must be shown, the reasonableness of the fee must be established, and the extent and duration of the services must be proven.
Assuming that Ms. Iles did receive 24-hour attendant care for the four years in question, at $10.00 per hour, we calculate the amount to be $350,424.00,[6] not the $453,325.68 awarded by the trial court. We reduce the amount of past attendant care accordingly.

(B.) Future Attendant Care
The issue of future attendant care was also contested. The parties presented several witnesses to state how many hours of attendant care Ms. Iles will require for the remainder of her life. The defendants contend that the issue is whether Ms. Iles' present and future ability to perform "activities of daily living" have been compromised due to her failure to receive appropriate and timely medical treatment for both her physical and psychological injuries. They also argue that the calculations by the plaintiff's expert, Stuart Wood, Ph. D., are inaccurate.
Ms. Iles spent a total of 50 days in Our Lady of the Lake Hospital in Baton Rouge and the rehabilitation unit at Touro Infirmary (a hospital) ("Touro") in New Orleans. After her release from the hospital, she underwent approximately five months of physical rehabilitation at Crane Rehabilitation Unit ("Crane") in New Orleans. Since her discharge from Crane, she has not received any additional rehabilitation therapy.
Her post-accident treating physician, Laxman Kewalramani, M.D., testified that he recommended cognitive therapy to Ms. Iles and her family, but it did not occur. *435 He also thought Ms. Iles would still benefit from a six-to-twelve-month in-patient program to improve her daily functions. He cautioned, however, that Ms. Iles is permanently disabled and would need attendant care for her lifetime.
Roberta Bell, Ph.D., was accepted as an expert in clinical psychology and neuropsychology, with a primary emphasis on TBI. She evaluated the plaintiff three times post-accident. On the first visit in December 2004, Ms. Iles reported that since the accident earlier that year, she had problems with vision; numbness; shoulder pain; disturbed sleep patterns; fatigue; remembering information from the past and present; impaired concentration; speech and language; reasoning and problem solving; and motor coordination. She also reported frustration, anxiety, and depression, as well as behavioral and emotional changes.
Dr. Bell also evaluated Ms. Iles in August 2005 and March 2008. At each visit, she performed a battery of tests to determine where the plaintiff was cognitively and her current deficits. Ms. Iles remained substantially below expectations in areas of overall intellectual performance, verbal and language comprehension, perceptional organizational skills, processing speed, math skills, speed and dexterity, constructional abilities, and left side strength. These permanent deficits are consistent with the severe TBI suffered by the plaintiff; they impact every aspect of her life. Dr. Bell testified that, while Ms. Iles would benefit from cognitive remediation and supportive emotional counseling, she would remain in constant need of care for her safety.
The defendants presented the testimony of Kevin Bianchini, Ph.D., who was also accepted as an expert in the field of clinical psychology and neuropsychology. In late January 2007, he conducted a four-day neuropsychological evaluation of Ms. Iles. Based on his review of the medical records, including the evaluations performed by Dr. Bell, he found that Ms. Iles had regressed since receiving rehabilitation in 2004. The records from Touro and Crane indicated that she was living independently for some periods of time. However, when she was evaluated by Dr. Bianchini and seen at trial, he agreed that she needed 24-hour care.
Dr. Bianchini testified that after her rehabilitation at Crane, she should have had "transitional rehabilitation" or "post-acute TBI rehabilitation" that would have improved her ability to function better in her home and possibly the community. Such rehabilitation would address all the cognitive, physical, and emotional problems that hold Ms. Iles back functionally. He believed that if she received this type of rehabilitation now, she could achieve a greater degree of independence and be left alone for periods of time. He explained that achieving a measure of independence is also important for an adult because an adult feels more capable and confident. In addition to recommending rehabilitation when he rendered his report in January 2007, he thought Ms. Iles needed two or three years of weekly psychotherapy to address the issues of losing her husband and her depression. Dr. Bianchini admitted, however, that Ms. Iles would never be completely independent in terms of her capacity, needing attendant care for the rest of her life.
Ms. Iles testified on her own behalf. She stated that Mr. Muckley did all the grocery shopping and cooking, paying of bills, and arranging for health, home, and automobile insurance. Ms. Iles was the one who fixed things around the house, such as the garbage disposal, a toilet, and minor electrical repairs.
*436 Her last memory of her husband is about 2-1/2 weeks before the accident; she has no memory of the accident itself. She testified that she needs help with everything: showering, dressing, fixing her hair, paying bills, and cooking. She takes medication for constant pain and has frequently fallen; a quad cane has helped prevent further falls. Although she recognizes that she needs assistance, she dislikes it. She has not lived alone since the accident. When no one is with her, she stays in bed.
The plaintiff presented the testimony of Robert D. Voogt, Ph.D., an expert in rehabilitation, counseling, and the preparation and cost of life care plans for people with TBI. Dr. Voogt runs two treatment facilities for TBI that address all deficits: physical, cognitive, and emotional. He prepared a life care plan entered into evidence after examining all of Ms. Iles medical records, including the neuropsychological testing by Drs. Bell and Bianchini. He agreed that intensive in-patient therapy would improve Ms. Iles' quality of life but not cure any of her deficits. Dr. Voogt stated that he looked at Ms. Iles as a ten or eleven-year-old: one who can do some things independently but with supervision. He also stated that because Ms. Iles has enough insight into her injuries, both physical and cognitive, she has significant depression, especially when coupled with the loss of her husband.
In addition to the neurological reports, Dr. Voogt received information from Ms. Iles' treating physician as to her future medical care. Using the figure of $14.50 per hour, he opined that Ms. Iles will require 24-hour care at a cost of $127,020.00 per year for the remainder of her life. Ms. Iles was 42 years old at the time of trial in April 2008 with a life expectancy of 38.05 additional years. He also testified that the appropriate in-patient care recommended by the other experts would cost $750.00 per day or $112,500.00 for a six-month program.
Under cross examination, Dr. Voogt was questioned about the hourly rate of $14.50 used by him in his calculations. He stated that he contacted two attendant care companies and was given $12.50 per hour and $18.00 per hour for attendant care services; however, his report admitted into evidence indicated that he averaged the hourly rates from two home health agencies: one for $14.00 per hour and the second for $15.00. He also calculated that a case manager would be required at a cost of $2,640.00 per year, equipment would cost $28.00 per year, and maintenance, such as home repair, house cleaning, and lawn care, would cost $7,015.00 per year. Along with the yearly attendant-care cost of $127,020.00, Ms. Iles' annual care costs would total $136,703.00.
He also testified that he had recommended an in-patient rehabilitation program to Ms. Iles' mother and sister in January 2005. However, he also said that, even if she had been placed in a rehabilitation program, he still believes that she will need 24-hour attendant care for the rest of her life.
Ms. Adams testified that she usually charges $12.00 per hour for attendant care services. However, because Ms. Iles' mother and sister were also helping out, Ms. Adams charged only $10.00 per hour. In her testimony, Ms. Adams expressed a willingness to again work for Ms. Iles if she returns to New Orleans.[7]
The defendants contend that had Ms. Iles received the intensive in-patient *437 rehabilitation care universally recommended by all the experts who testified, she would not require 24-hour attendant care. However, several of the plaintiff's experts stated that even with rehabilitation, Ms. Iles would require around-theclock care. The trial court was well within its discretion to accept this testimony. However, we do not agree with the defendants that the amount awarded for future attendant care is manifestly erroneous and clearly wrong.
Stuart Wood, Ph.D., the plaintiff's forensic economist whose testimony regarding loss of support is found in our discussion infra of evidence regarding awards for past and future loss of support, used the figure provided by Dr. Voogt and provided the trial court with two figures representing the present value of cost of attendant care, etc., over Ms. Iles' lifetime. The first highest was $4,707,900.00, which provided for a growth rate of 1% per year, discounted by 1.8%, and the lowest was $3,943,971.00, which provided for no growth rate, discounted by 1.8%, the figure awarded by the court. This 1.8% discount rate is based upon the value of long term United States Treasury Inflation-Protected Securities (known as "TIPS").
The defendants suggest that the highest amount that the trial court could have awarded is $3,664,548.00; based upon Ms. Iles life expectancy of 38.05 years, this figure represents a gross hourly wage of approximately $10.85 for a 24-hour day for 365 days per year, and does not take into account future increases in the cost for the attendant care due to inflation. The defendants apparently used a discount rate of 2% to arrive at their figure of $3,664,548.00, assuming one used Dr. Voogt's $14.50 per hour rate. Contrariwise, the trial court awarded the lower of the two amounts testified to by Dr. Wood. This was within the trial court's discretion. Therefore, we decline to reduce the award of $3,943,971.00 found by the trial court as being neither manifestly erroneous nor clearly wrong.

2. PAST AND FUTURE LOSS OF SUPPORT
We next address the issues of past and future loss of support. The trial court awarded $2,950,957.00 for past loss of support and $20,000,000.00 for future loss of support. We find these amounts to be manifestly erroneous and clearly wrong for they are not supported by competent evidence of record. We are required to reduce the trial court's award to the highest amounts that a reasonable fact finder could award based upon competent evidence
Past and future loss of support from Mr. Muckley's earned income does not pose a difficulty; these calculations are routinely made in wrongful death cases. However, the past and future loss of support from his unearned or passive income is problematic. Although no party to these proceedings raised the issue, we questioned the parties' counsel extensively at oral argument and ordered additional briefing on whether the plaintiff stated a cause of action against the defendants for the loss of unearned income, i.e., her share of the community income to which she had a right by virtue of the income derived from her husband's securities (stocks and bonds) that were his separate property. La. C.C.P. arts. 927 B, 2164, and 2129.[8] *438 The issue is relevant because Mr. Muckley never executed the new last will and testament that had been prepared for him in which he intended to leave all but $550,000.00 of his separate and one-half of his community property to the plaintiff.[9] The evidence in the record establishes that Mr. Muckley and the plaintiff were on their way to Texas for him to execute his new testament at the time of the accident.[10]

(A.) Is there a Cause of Action for Loss of Unearned Income?[11]
We find the issue of whether a cause of action in a wrongful death case exists in favor of the decedent's spouse for unearned community income derived from the decedent's separate property is res nova after an extensive search of the jurisprudence of Louisiana. We have also searched the jurisprudence of the other states, and apparently, only the state of Michigan has recognized a cause of action for the loss of unearned income when the failure to execute a new testament deprives the plaintiff of the subsequent unearned income of the deceased.[12] Why this issue has not been raised before is unclear, except we do find that the successors to a deceased generally inherit the deceased's assets and, thus, no loss of income from passive investments results. For example, in Sorrells v. Eddie Knippers & Associates, Inc., 544 So.2d 556 (La. App. 1st Cir.1989), the court found that the *439 trial court erred in allowing the economist to include income that was not dependent upon the decedent's efforts (rents and interest), stating: "thus, we must assume would continue after his death." Id. at 562. In effect, the court found that the plaintiff had inherited the unearned income producing property. In the instant matter, Ms. Iles did not inherit the assets that were producing the unearned income; thus we are confronted with the issue.
We recognize the basic right of tort law, that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. C.C. art. 2315. Concomitantly, we apply a duty-risk analysis to the surrounding facts of the accident of this case.[13] That is to say, but for Dr. Ogden's negligence that resulted in the death of Mr. Muckley and the massive damages sustained by Ms. Iles, both Mr. Muckley and Ms. Iles would still be receiving and living on the unearned income from Mr. Muckley's separate property.
By law, "[m]arried persons owe each other fidelity, support, and assistance." La. C.C. art. 98. As the Revision Comments1987 to article 98 state in pertinent part:
The jurisprudence decided under the source provision has held that the spouses' duty to support each other is limited to furnishing the necessities of life. Smith v. Smith, 382 So.2d 972 (La.App. 1st Cir.1980); Hingle v. Hingle, 369 So.2d 271 (La.App. 4th Cir.1979); see 1 M. Planiol, Traite elementaire de droit civil, nos. 904-905 (La. State Law Ins. Transl.1959). Nevertheless, the term "support" has been construed to include the cost not only of food, clothing, and shelter, but also of operating such conveniences as telephones, home appliances, and an automobile. Bernhardt v. Bernhardt, 283 So.2d 226 (La.1973) (construing C.C. Art. 160 (1870)). The duty to render assistance, insofar as it is separate from that of support, includes the personal care to be given an ill or infirm spouse. 1 M. Planiol, supra, no. 917; James v. State Through Board of Administrators of Charity Hospital, 154 So.2d 497 (La.App. 4th Cir.1963).
Ms. Iles sustained a real loss of a portion of the unearned, passive income that Mr. Muckley was receiving, which ceased through Dr. Ogden's negligence.[14] By virtue of the community of acquets and gains that existed between Mr. Muckley and Ms. Iles, it is not unreasonable to say that she was entitled to the value of one-half of Mr. Muckley's passive, unearned income. La. C.C. arts. 2338, 2339, and 2369.2.[15] Mr. *440 Muckley would owe a duty to care for his wife from the entire community income derived from his separate property. We find that the loss of the unearned income was in fact caused by the negligence of Dr. Ogden; thus he ought to have a duty to "repair it." La. C.C. art. 2315.
Under the precise, if not extraordinary, facts of this case, we find that Ms. Iles states a cause of action against the defendants for her share of the loss of unearned, passive income that Mr. Muckley received from his separate property. As a result of his death, Mr. Muckley could not and did not execute his new testament waiting for his signature in Texas, resulting in the University of New Orleans inheriting most of Mr. Muckley's estate.
From the foregoing, we find that one has a claim for a loss of unearned, passive income against a tortfeasor for the wrongful death of a spouse if: (1) the deceased spouse's primary source of income is derived from interest, dividends, rents, royalties, et cetera of the separate, as opposed to community, property of the deceased spouse; (2) the spouses were substantially, if not totally, living on the income derived from such sources; and (3) the income is community income and not the separate income of the decedent pursuant to a reservation of same.[16] La. C.C. art. 2339. To determine the extent of the loss one must consider: (a) whether the parties were living together at the time of the deceased spouse's death, (b) the relationship of the parties during the months preceding the deceased spouse's death, (c) the recent percentage of the income consumed by the surviving spouse during the marriage, and (d) other relevant factors. If no evidence exists as to the percentage of community income consumed by the surviving spouse, the presumption exists that fifty percent of the passive, unearned income was being consumed by each spouse, excluding savings, *441 if any.[17] Ordinarily, the calculation of the loss to the surviving spouse is made by (1) using the annualized percentage of the gross income consumed by the surviving spouse during the marriage, (2) reduced by the percentage of annualized income that the surviving spouse will derive from the separate property inherited from the decedent,[18] (3) multiplied by the life expectancy of the deceased spouse as determined from expert testimony in the case or other relevant tables of life expectancy, and (4) discounted back to present value using a discount rate as determined by expert testimony or other relevant tables.

(B.) Is there a Cause of Action for Loss of Inheritance?
Louisiana jurisprudence does not clearly indicate whether loss of a prospective inheritance is a recoverable element of damages in a wrongful death action. See Wrongful Death Damages for Loss of Expectancy of Inheritance from Decedent, 42 ALR 5th 465, § 5(b) (1996). A pair of federal cases in 1986 arising from Louisiana declined to award the loss of inheritance damages: first, because the courts could not determine whether such damages were recoverable under Louisiana law and second, the evidence in support of such a reward in the respective cases was too speculative. See Marks v. Pan American World Airways, Inc., 785 F.2d 539 (5th Cir.1986); In re Air Crash Disaster in New Orleans, 795 F.2d 1230 (5th Cir. 1986). These federal cases must be reviewed in light of Louisiana positive legislation.
Mr. Muckley's testament admitted to probate was clearly a Louisiana testament meeting the requirements of Louisiana law that established its validity.
Specifically, however, La. C.C. arts. 1607 states:
Revocation of an entire testament occurs when the testator does any of the following:
(1) Physically destroys the testament, or has it destroyed at his direction.
(2) So declares in one of the forms prescribed for testaments or in an authentic act.
(3) Identifies and clearly revokes the testament by a writing that is entirely written and signed by the testator in his own handwriting.
La. C.C. art. 1608 states:
Revocation of a legacy or other testamentary provision occurs when the testator:
(1) So declares in one of the forms prescribed for testaments.
(2) Makes a subsequent incompatible testamentary disposition or provision.
(3) Makes a subsequent inter vivos disposition of the thing that is the object of the legacy and does not reacquire it.
(4) Clearly revokes the provision or legacy by a signed writing on the testament itself.

*442 (5) Is divorced from the legatee after the testament is executed and at the time of his death, unless the testator provides to the contrary. Testamentary designations or appointments of a spouse are revoked under the same circumstances.
See also La. C.C. art. 1976 and footnote 21 infra.
Thus to revoke a valid Louisiana testament, a testator must follow one of the formalities set forth in Louisiana's positive law to do so. This Mr. Muckley never did.
In Hollingsworth v. State of Louisiana, Through Dept. of Transp. and Development, 95-285, pp. 7-8 (La.App. 3 Cir. 10/4/95), 663 So.2d 357, 360-61, the court stated:
Whether loss of inheritance is a proper element of damage in a wrongful death action under La.Civ.Code art. 2315 has not been addressed by any Louisiana court. In Pennington v. Justiss-Mears Oil Company, 123 So.2d 625 (La.App. 1 Cir.1960), the wife and three young children were denied loss of inheritance damages. The denial was based on a finding that in the circumstances of that case such a loss was speculative. The court did not pass on whether loss of inheritance is or is not recoverable as a matter of law. Likewise, in Parker v. Smith, 147 So.2d 414 (La.App. 2 Cir.1962), treating the concept as "loss of a reasonably anticipated inheritance", the court denied the claim finding that the record was barren of any evidence whatever on which an award of that type could be made. A Federal Court of Appeals decision, Tallentire v. Offshore Logistics, Inc., 754 F.2d 1274 (5th Cir.1985), finding no Louisiana dispositive law, affirmed a rejection of such damages with the observation that on the facts "to determine what portion of [the deceased's] income might have wended its way into assets which would have formed a part of the inheritance of the children would be mere speculation."
Like the other courts before us, we will not go so far as to say that there will never be a case where the evidence is demonstrably clear that a loss of inheritance has been suffered, and so we will not declare that such an award is inappropriate as a matter of law. However, we do not think that the evidence in this case is of such extraordinary circumstances as to give rise to proof that Christy indeed suffered a loss of inheritance. The word "speculation" means an assumption not based on demonstrable evidence. Webster's Ninth New Collegiate Dictionary 1133 (1988). [Emphasis supplied.]
In 1986, the Supreme Court of Texas, in Yowell v. Piper Aircraft Corp., 703 S.W.2d 630, 632-33 (Tex.1986), established a cause of action for loss of inheritance, stating:
Substantial federal and state authority allows a beneficiary to recover for loss of inheritance caused by a decedent's wrongful death.[19] Such damages are recoverable under the Federal Employer's Liability Act, as well as the Death on High Seas Act. Martin v. Atlantic Coast Line R. Co., 268 F.2d 397, 399 (5th Cir.1959) (Federal Employer's Liability Act); National Airlines, Inc. v. Stiles, 268 F.2d 400, 403-404 (5th Cir.1959) *443 cert. den. 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121, reh. den. 361 U.S. 926, 80 S.Ct. 291, 4 L.Ed.2d 241, (Death on High Seas Act).
* * *
The relatively few courts which have denied this type of recovery have done so not by excluding the loss from pecuniary damages but by holding the amount of the loss too speculative. See Baker v. Slack, 319 Mich. 703, 30 N.W.2d 403, 407 (1948); McCleod v. Tri-State Milling Co., 71 S.D. 362, 24 N.W.2d 485, 491 (1946). See generally J. Stein, Damages and Recovery: Personal Injury and Death Actions § 243 (1972). Though probably nothing is more certain than the uncertainty of human life, presuming that thrifty persons will accumulate an estate and leave it to their heirs at death is no more speculative than finding any of the other recognized elements of pecuniary loss in a wrongful death action, such as lost support, guidance, and training. "Statutes giving damages for injuries resulting in death necessarily deal with probabilities," and necessarily indeterminate damages are properly left to the sound sense of the jury. San Antonio & A.P. Ry. Co. v. Long, 87 Tex. 148, 27 S.W. 113, 117, 118 (1894).
* * *
We define loss of inheritance damages in Texas as the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death. True, not every wrongful death beneficiary sustains loss of inheritance damages. If the decedent would have earned no more than he and his family would have used for support, or if the decedent would have outlived the wrongful death beneficiary, loss of inheritance damages would properly be denied. This is for the jury to decide.
If a cause of action for the loss of an inheritance does exist when the decedent dies due to the fault of another and before he can execute a testament, then an argument exists that a survivor as defined in La. C.C. arts. 2315.1 and 2315.2 may bring a suit to collect for the loss.[20] In the case at bar, Ms. Iles would have received most of Mr. Muckley's estate if he had lived and made it to Texas before the accident caused by the sole fault of Dr. Ogden. Ms. Iles would have essentially inherited all of Mr. Muckley's separate property and one-half of the community property, and thus the cause of action against the defendants for the loss of future support derived from Mr. Muckley's passive, unearned income would be unnecessary, irrelevant, or minimized.
The record establishes by a preponderance of the evidence that the plaintiff and the deceased were on their way to Houston for the decedent to sign a new testament, a copy of which was admitted into evidence by the trial court. The actual amount of the inheritance, $5.4 million at the date of death or almost $7.4 million on the date of trial, was also established through numerous witnesses and documentary *444 evidence. If Ms. Iles was entitled to the lost inheritance, then the precise value of her loss would not be speculative, but would be ascertainable, essentially as a sum certain. Thus, one might say that this case contains evidence of such extraordinary circumstances and weight as to give rise to proof that Ms. Iles indeed suffered a loss of an inheritance due to the negligence of Dr. Ogden.
The trial court denied the claim for the loss of inheritance based in part on La. R.S. 13:5106, which states in pertinent part:
B. (1) The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.
* * *
C. If the state or a state agency or political subdivision is held liable for damages for personal injury or wrongful death, the court shall determine:
(1) The amount of general damages exclusive of:
(a) Medical care.
(b) Related benefits.
(c) Loss of earnings and/or support.
(d) Loss of future earnings and/or support.
(2) The amount of medical care, related benefits and loss of earnings and/or support to date of judgment.
(3) Whether the claimant is in need of future medical care and related benefits and the amount thereof; and
(4) Whether there will be a loss of future earnings or support, and the amounts thereof.
In Cooper v. Public Belt R.R., 03-2116 (La.App. 4 Cir. 10/6/04), 886 So.2d 531, writ denied, 04-2748 (La.1/28/05), 893 So.2d 75, this court addressed the issue of whether "loss of earning capacity" was incorporated in loss of support or subsumed in the general damages category; loss of earning capacity is not delineated in La. R.S. 13:5106 C(1). The court held that it was properly contained within general damages, noting:
Finally, in addition to the establishment of the $500,000.00 limitation subject to the exclusions set forth in La. R.S. 13:5106 B(1), the manner in which those exclusions are specifically referenced again in La. R.S. 13:5106 C(1) emphasizes the legislative consciousness of the specific nature of the enumerated exclusions and concomitantly serves to support the conclusion that the legislature by creating such a specific list did not intend to include items of damage customarily considered separately, such as loss of earning capacity.
Id. at p. 12, 886 So.2d at 539.
We agree with and are bound by the result in Cooper with regard to the "loss of earning capacity." Cooper must be balanced against La. C.C. arts. 1607 and 1608, neither of which were at issue therein. A claim for loss of the value of an inheritance is logically included in La. R.S. 13:5106 C(1)(d), "loss of future support," if the claim is properly supported by the record. If the evidence is not speculative and capable of mathematical calculation, then a loss of the value of an inheritance is a specific damage and not a general damage. In such a case, it would be included in La. R.S. 13:5106 C(1)(d). In the case at bar, the loss of the value of the inheritance can be determined by reference to the *445 evidence in the record that stated the amount of income derived from Mr. Muckley's separate property on the date of death, as well as on the date of trial.

(C.) Evidence Regarding Awards for Past and Future Loss of Support
Ms. Iles presented four witnesses to aid the trial court in determining appropriate awards for past and future loss of support. The first to testify was Benjamin C. Woods, a CPA from Shreveport, who was accepted as an expert in forensic accounting, certified public accounting, and valuation analysis. He was retained to look at the spending of the Muckleys' household and determine what percentage was related to personal consumption. He relied on tax returns, checking account information, and conversations with Justin Ricou, Mr. Muckley's long-time accountant and Mr. Woods' colleague, to assist him in making his analysis. He examined a 26-month period prior to the accident and determined that the average spending per month of the Muckleys was $16,354.49, with the average of household/personal consumption of $8,485.18 per month for 2001 and 2002. However, in 2003, the average monthly consumption rose to approximately $9,500.00 to $10,000.00.
Justin Ricou, a CPA, prepared the Muckleys' tax returns from the mid-1990s until the time of Mr. Muckley's death. Mr. Ricou filed the Muckleys' 2003 tax returns about a month after Mr. Muckley's death in April 2004.[21] He also prepared a list of assets and liabilities as of the date of death and date of trial, which included verifiable assets, an estimated value of the assets, and total value of the assets. At the time of death, Mr. Ricou stated that Mr. Muckley's estate was worth $5.4 million, exclusive of real estate, although he could verify only $5.1 million; the $5.4 million represented his investment portfolio.[22] Mr. Ricou could not remember the percentage of the securities that were bonds versus stocks, but knew that Mr. Muckley used two different brokers. He believed that the brokerage account in Houston, Texas, was mostly of municipal bonds while the brokerage account in Ohio consisted primarily of equities. In 2003, the bonds paid almost $95,000.00 in tax-exempt interest, while the stocks paid $42,990.00 in dividends.
Mr. Ricou was also the CPA for Electronic Controls, Inc. ("ECI"), a corporation that had elected to be treated as an "S corporation" for federal tax purposes, and in which Mr. Muckley owned a one-third interest valued at $350,000.00 at the time of his death. In 2003, Mr. Muckley's share of the income was $125,911.00. Pursuant to 26 U.S.C.A. § 1366(c), Mr. Muckley had to report the ECI income on his individual federal tax return because of ECI's status as an "S corporation." The record fails to indicate whether Mr. Muckley actually received the disbursement of $125,911.00. (Mr. Muckley was a minority shareholder by virtue of his ownership of but one-third of the shares of ECI.) Although this amount is added to one's federal tax return to compute gross income for federal income tax purposes, it may not actually be received by the taxpayer or capable of being spent by the taxpayer because of its nonreceipt. See, generally, Instructions for Form 1120S, U.S. Income Tax Return for an S Corporation Shareholder's and Instructions for Schedule K-1 (Form *446 1120S), Shareholder's Share of Income, Deductions, Credits, etc. Thus, it would be properly excluded from any calculation of what Mr. Muckley had as disposable income. Mr. Muckley drew a salary from ECI and the corporation paid his health insurance.
Mr. Ricou also testified that prior to Mr. Muckley's marriage to Ms. Iles, he had a telephone conversation with Mr. Muckley wherein Mr. Ricou suggested a pre-nuptial agreement to protect Mr. Muckley's assets from the community property laws of Louisiana. Mr. Muckley reacted by hanging up the telephone and the men did not speak for about three months.
The third witness for the plaintiff was Joseph P. Brantley, an attorney and executor of Mr. Muckley's estate, as well as his good friend for 25 years. He explained that the will in effect at the time of death was done when Mr. Muckley had but seven or eight hundred thousand dollars in his estate. Mr. Muckley was leaving $600,000.00, the bulk of his estate, to his wife with the University of New Orleans ("UNO") receiving approximately $200,000.00. The purpose of the new testament was to leave UNO the same amount as before and, other than a few specific bequests, leave Ms. Iles the bulk of the estate. In essence, the resulting inheritances for UNO would have resulted in UNO inheriting the same amount under the actual signed testament admitted to probate and the testament that was never executed because Mr. Muckley never made it to Houston. He noted that Mr. Muckley and Ms. Iles were traveling to Houston to execute the new will when the accident occurred.
Mr. Brantley testified that an irrevocable trust, presently essentially unfunded, had been set up for Ms. Iles at a "conservative" New Orleans bank.[23] The trust provides that it can only be invested in AA-rated or better fixed income securities, such as bonds.[24] The trust will provide Ms. Iles with the cost of basic necessities plus monthly revenue that will increase over time. Presently, the trust has little money, but the plan appears to be that all money she receives in the future is supposed to be placed in the trust and invested accordingly. She will inherit $600,000.00 from Mr. Muckley's estate and possibly a marital portion pursuant to La. C.C. art. 2432.[25]
When asked about the relationship between Mr. Muckley and Ms. Iles, Mr. Brantley described it as a "very, very, good strong relationship."
The last witness for the plaintiffs was Stuart Wood, Ph.D., who was qualified as an expert in forensic economics. Dr. Wood is a professor and is occasionally *447 hired to prepare expert reports in personal injury and wrongful death cases. He prepared such a report in this case.
Dr. Wood was first questioned about the defendants' expert economist, Kenneth Boudreaux, Ph.D. Dr. Wood explained that he has known Dr. Boudreaux all his life, they are very close friends, and work together, often as "co-signatories" on expert economic reports. This means that they both sign an expert report and, therefore, either one can give a deposition or testify in court if a conflict arises in one of their schedules. In the instant case, they are testifying against one another.
Dr. Wood defined "loss of support" as the total family income less the deceased's personal consumption expenses. He opined that it is generally recognized that the personal consumption of a decedent is approximately 34%.[26]
In making his calculations, Dr. Wood separated wages from investments. In order to determine the loss of support from wages, Dr. Wood made certain assumptions. The first was Mr. Muckley's life expectancy on the date of trial, which was 22.17 years. He also assumed that Mr. Muckley had a work life expectancy of 8.14 years. Next, Dr. Wood assumed that Mr. Muckley's earned wages, amounting to $18,675.00 for 2003, which would increase at the rate of 3.5% per year. He then assumed that the average family consumption was $10,000.00 per month or $120,000.00 per year. After calculating Mr. Muckley's total wages for a work life expectancy of 8.14 years, taking into account an inflation rate of 10-15% per year,[27] Dr. Wood subtracted out a consumption of 34%, and then discounted the total to a present value lump sum. The discount rate he used, 4.42%, came from rates on U.S. Treasury bonds that are considered to be risk free. He concluded that the present value of Ms. Iles' loss from Mr. Muckley's past wages was $53,769.57. For future loss of support from the date of accident to the end of his work life expectancy, he calculated the total amount of future wages to be $122,589.50
Turning to the investment income, Dr. Wood assumed that Mr. Muckley's portfolio would produce average rate of return of 11% per year, which represents the average rate of return over 25 years for a portfolio of large-capitalized common stocks. He admitted, however, that approximately half of the portfolio was not invested in the stock market, but instead in municipal bonds that pay a much lesser rate of return. Despite that fact, Dr. Wood assumed that the entire portfolio was in stocks to make the calculations for loss of support.[28]
*448 We find that an investment strategy as suggested by Dr. Wood (an investment totally in equities) would as a matter of Louisiana law constitute mismanagement if made by a trustee of a trust for someone with Ms. Iles health problems and as sizable as it will be or if made by Ms. Iles if she chose the strategy herself given her health. La. R.S. 9:2127 states:
Unless the trust instrument provides otherwise, a trustee shall invest and manage trust property as a prudent investor. In satisfying this standard, the trustee shall consider the purposes, terms, distribution requirements, and other circumstances of the trust. A trustee's investment and management decisions are to be evaluated in the context of the trust property as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust. In investing within the limitations of the foregoing standard, a trustee is authorized to retain and acquire every kind of property. [Emphasis supplied.]
The 2001 Comments to La. R.S. 9:2127 state in pertinent part:
(a) The primary source of the new formulation for this Section is Section 2 of the Uniform Prudent Investor Act (1994). It sets forth the "prudent investor rule", which has been widely adopted in the other states in place of the "prudent man rule". The prudent investor rule makes it clear that the trustee's duty is determined by the purposes of the trust and the circumstances of the beneficiaries, not in light of how a prudent man would manage his own property.
(b) The prudent investor rule makes it clear that the prudence of the trustee's actions is determined with respect to the portfolio as a whole: "an investment that might be imprudent standing alone can become prudent if undertaken in sensible relation to other trust assets, or other nontrust assets." (Quote from comment to Uniform Prudent Investor Act (1994) Section 2.)
(c) Diversification usually is necessary to reduce risk. For small trusts this can be accomplished through pooled investments such as mutual funds. See R.S. 9:2087. "Circumstances can, however, overcome the duty to diversify. For example, if a tax-sensitive trust owns an under diversified block of low-basis securities, the tax costs of recognizing the gain may outweigh the advantages of diversifying the holding. The wish to retain a family business is another situation in which the purposes of the trust sometimes override the conventional duty to diversify." (Quote from comment to Uniform Prudent Investor Act (1994) Section 3.) [Emphasis supplied.]
Dr. Wood stated that some of the income produced by the portfolio was consumed and some was reinvested. He labeled the reinvested part "the lost past saved income." Dr. Wood testified that in his opinion $2,563,354.00 is the amount that would have been generated from the savings and, using an 11% rate of return,[29] the income on those savings from date of accident to date of trial. Taking into account the total of investment income *449 and wages, Dr. Wood stated that in his opinion the past loss of support was $2,950,947.48.
In determining loss of future support on earned income, Dr. Wood calculated Ms. Iles' loss of consumption from the end of Mr. Muckley's life expectancy (to year 2030) to the end of her life expectancy (to year 2046), discounted to present value, was $3,426,680.00.[30] He then stated that the present value of the loss of future passive income was $43,895,251.00, for a total loss of future support of $47,444,521.15.[31] However, taking into account Louisiana's community property laws, he calculated the Ms. Iles' loss of future support from the portfolio to be $14,486,393.00.
The defendants presented Dr. Kenneth Boudreaux, who was also accepted as an expert in forensic economics. He used the same work life and life expectancy assumptions as Dr. Wood. To calculate the loss of past and future earned income, Dr. Boudreaux used a lower yearly income than Dr. Wood ($16,000.00 versus $18,000.00) because he noted that the Muckleys' tax returns included some business losses in prior years. He determined that the past loss of earned income was $44,317.00 and the highest amount of loss of future earned income was $96,000.00.
In determining the loss of past passive income, Dr. Boudreaux also began with a portfolio of $5.4 million as of the date of death. On Mr. Muckley's 2003 tax return, he had a total of $120,017.00 of interest income: $94,083.00 was tax-exempt interest and $25,934.00 was taxable. He concluded that a substantial amount of the portfolio was fixed-income securities. He estimated that there were at least $2,667,000.00 of bonds, or 49% of the total securities portfolio, and 51% in equities at the time of death. Consequently, he based his projections on an 11% return on the equities and a 4.5% return on the fixed income securities for an average rate of return of 7.82%; this percentage was also used by him as the discount rate for making calculations as to Ms. Iles' losses of income resulting from Mr. Muckley never having executed his new will. He testified that the amount of the lost past passive income was $1,065,434.16.
Turning to the issue of future loss of support, Dr. Boudreaux explained that his number and Dr. Wood's number were so far apart because Dr. Wood used an average rate of return of 11% for the entire portfolio, but a riskless interest rate of 4.5% for the discount value. In his opinion the evidence did not support Dr. Wood's methodology.[32] Mr. Muckley was a conservative investor and nothing in the record would support the assumption that Ms. Iles would have changed that strategy had she inherited the $5.4 million portfolio. However, he stated that had he and Dr. Wood used the same discount rate, the results would have been very close.
With regard to earned income loss of support, Dr. Boudreaux also used a discount rate of 4.5%. He explained that a basic tenet of financial economics is that when valuing an asset based on its income *450 stream, a discount rate consistent with the riskiness of the cash flow being projected is used. But he could not use the rate used by Dr. Wood with regard to the portfolio; Dr. Boudreaux could offer no reasonable explanation to relate a riskless interest rate to risky securities.
When making his calculations for loss of future passive income, Dr. Boudreaux used $120,000.00 as the total family's consumption and five different investment rates. However, the highest loss of support figure he presented was $4,432,515.00 and the lowest was $2,319,000.00. He also agreed that, if given the chance, Ms. Iles would likely change Mr. Muckley's portfolio overwhelmingly into fixed income securities, probably an 80%-20% ratio.[33] The rate of return would then drop from 7.82% to approximately 5.5%. Without touching the principle, he calculated that an investment of $3.4 million would yield about $200,000.00 per year; if a life annuity was purchased, it would yield more.
Dr. Boudreaux also noted that he and Dr. Wood differed on the issue of including savings in the calculation; Dr. Wood included savings, while he did not. Dr. Boudreaux explained that there can't be a loss of support claim for savings that are not consumed by the survivor.
On rebuttal, Dr. Wood stated that the court could not reach a number between those calculated by the experts. He criticized his colleague's opinion, remarking that he had never seen an economic analysis for loss of support that excluded savings. Finally, he admitted that if Mr. Muckley were alive, he would have used a discount rate close to the investment rate of return used by Dr. Boudreaux. However, he testified that the same amount of money in Mr. Muckley's hands had he lived does not have the same value if it were put in the hands of Ms. Iles. This is because (1) she will need to invest in different securities, such as bonds, and (2) she is mentally and physically impaired. He stated that she could earn the same return as Mr. Muckley if the investments remained the same, but then she would bear considerably more risk, risk from which she was shielded by Mr. Muckley. Dr. Wood also testified that if Ms. Iles were awarded $47 million for loss of support, she would earn almost $2 million dollars a year with a riskless rate of return of 4.2%.[34]
The trial court awarded Ms. Iles the amount of $2,950,947.00 for past loss of support and the sum of $20 million for loss of future support, from both earned and passive income. The court did not break down the figures. Because the amount for past loss of support, both earned and unearned, is the same figure Dr. Wood computed, we assume that this award includes $53,769.57 for past earned income and the remainder represents past loss of support from unearned income and the past lost saved income.
Dr. Boudreaux testified that the past earned income totaled $44,317.00. However, Dr. Wood testified that the loss of future support from earned income was $122,589.50; Dr. Boudreaux calculated this element of damage as $92,000.00. We find no error in the amounts testified to by Dr. Wood, these being the highest amounts in the record. Therefore, we amend the judgment to reflect awards of $53,769.57 for past earned income and $122,589.50 for future earned income.
*451 In its reasons for judgment, the trial court stated that it based its $20 million award for future loss of support from the portfolio on the testimony and the record containing documentation as to the value of Mr. Muckley's estate, the relationship and standard of living of Mr. Muckley and Ms. Iles, their education, life expectancies, and Mr. Muckley's work life expectancy. The court also considered the testimony from the CPAs relative to income earned, tax returns, and spending and consumption of Mr. Muckley and Ms. Iles. The court recognized that all this information was used by the forensic economists to make their projections and opined as to the amount of future support Ms. Iles would lose as the result of Mr. Muckley's wrongful death.
The court compared the testimony of Drs. Wood and Boudreaux, noting their long-standing history as colleagues. The two primary differences were (1) whether savings should be used along with consumption in projecting the future loss of support and (2) the discount rate used to determine present value. Dr. Wood included savings and used a riskless discount rate, whereas Dr. Boudreaux did not include savings and used a risk-adjusted rate for future income from the portfolio. Because Dr. Boudreaux has always used a riskless discount rate in the past, the trial court found that it was appropriate to use Dr. Wood's proposed methodology in arriving at the award. However, the trial court rejected Dr. Wood's final calculation as being unreasonably high and Dr. Boudreaux's opinion for being insufficient. Without explaining its own methodology, the trial court awarded Ms. Iles $20 million for loss of future support.
The defendants' argue that the trial court was required to accept either Dr. Wood's figures or Dr. Boudreaux's figures and not arrive at a number in between. We disagree.
Unlike awards for past lost earnings, awards for lost future income or loss of future earning capacity are inherently speculative and are intrinsically incapable of being calculated with mathematical certainty. Williams v. Rubicon, Inc., 01-0074, p. 10 (La.App. 1st Cir.2/15/02), 808 So.2d 852, 862, writ denied, 02-0802 (La.12/4/02), 833 So.2d 942, cert. denied, 540 U.S. 812, 124 S.Ct. 54, 157 L.Ed.2d 25 (2003). For that reason, the trial court is given much discretion in fixing such an award. Id. Additionally, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850, 853 (La.1990). [Emphasis added.]
Jenkins v. State, 06-1804, p. 37 (La.App. 2 Cir. 8/19/08), 993 So.2d 749, 772-73. See also Rathey v. Priority EMS, Inc., 04-0199, p. 51 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 471. ("The court must exercise sound discretion in determining the award [of future lost wages or loss of earning capacity]."), citing Reichert v. Bertucci, 96-1213, p. 8 (La.App. 4 Cir. 12/4/96), 684 So.2d 1041, 1046. A fact finder may accept or reject the opinion expressed by an expert witness, in whole or in part. Ryan v. Zurich American Insurance Company, 07-2312, p. 12 (La.7/1/08), 988 So.2d 214, 222.
In Rogers v. State, Through Department of Transp. and Development, 00-1424, p. 10 (La.App. 4 Cir. 3/7/02), 813 So.2d 495, 504, this court discussed the amount of damages that an appellate court can award after finding an abuse of discretion by the trial court. We stated that "[a]fter it has been determined that there has been an *452 abuse of discretion, the appellate court can increase the amount of the award to the lowest reasonable amount within the discretion of the trier of fact." The ruling in Rogers comports with the Louisiana Supreme Court's statement in Powell v. Regional Transit Authority, 96-0715 n. 10 (La.6/18/97), 695 So.2d 1326, 1332, that "the award [of damages], if abusive of discretion, is not disregarded, but rather is reduced to the highest amount or raised to the lowest amount within the reasonable range of discretion."
Therefore, we examine the award under the abuse of discretion standard. We find that the trial court abused its discretion by awarding Ms. Iles $2,950,947.00 for loss of past passive, unearned income. Dr. Wood testified that Ms. Iles would save some of her yearly income and reinvest it with a yearly rate of return of 11%. However, nothing in the record supports this supposition. Speculation, guessing, or a mere possibility is insufficient to sustain a finding of fact or an award. Parfait v. Transocean Offshore, Inc., 04-1271 (La.App. 4 Cir. 8/10/07), 992 So.2d 465, 488 (Tobias, J., concurring in part and dissenting in part). Therefore, we find that the figure calculated by Dr. Boudreaux, $1,065,434.16, is the appropriate amount for loss of past passive income. We agree and amend the judgment accordingly.
The trial court awarded the sum of $20 million for loss of future support, rejecting both amounts suggested by the experts. Not only is this figure excessively high, but we also find that the trial court erred in using Dr. Wood's proposed methodology. Dr. Wood's calculations were not based on the evidence in the record. It was an error for him to use an average rate of return of 11% per year, which represents the average rate of return over 25 years for a portfolio of large-capitalized common stocks, when more than half of Mr. Muckley's portfolio was invested in municipal bonds that pay a much lesser rate of return. In addition, $20 million invested at 2% a year would yield yearly interest income of $400,000.00, far more than Ms. Isles and her husband consumed in any given year.
Viewing the Muckleys' 2003 federal income tax return, we observe that the total unearned income derived from Mr. Muckley's separate property is $163,665.00. If the one adds the S corporation income, the total unearned income would be $289,576.00. For the reasons stated above, we do not find that the S corporation income should be included in the calculation because no evidence establishes that the money was ever or would ever be received by the Muckleys; the amount would merely be reinvested in the corporation. As discussed above, Ms. Iles' annual one-half share of the income would be either $81,832.50 (if the S corporation income is excluded) or $144,788.00 (if the S corporation income is included). Over Mr. Muckley's life expectancy of 22.17 years, Ms. Iles' total share of the income from Mr. Muckley's separate property is $1,814,226.50 without S corporation income or $3,209,949.90 with S corporation income. If one were to use Ms. Iles' life expectancy, the amount would respectively be $3,113,726.60 and $5,509,183.40.[35] We discount this back to present value using a discount rate of 4.2% (the return from United States treasury bonds),[36] resulting *453 in a respective sums of $728,725.85, $1,289,350.30, $650,749.39, and $1,151,384.88. If, in the alternative and for purposes of illustration, one used the TIPS discount rate of 1.8%, the respective amounts would be $1,221,583.81, $2,161,374.46, $3,158,693.74, and $5,588,744.72. Presumptively the income from Mr. Muckley's separate property would have increased over his 22.17 years of life expectancy. However, such increase would never approach the value of the loss of the estate that Ms. Iles sustained because of Dr. Ogden's negligence.[37] Based on the appellate record and our explanation above, we calculate Ms. Iles loss to be $728,725.85. However, the defendants have stated in their brief that the correct amount is the amount calculated by Dr. Boudreaux. Because we are required to reduce the award to the highest amount that a reasonable fact finder could award, we will award $4,432,515.00, the highest amount testified to by Dr. Boudreaux.

3. DEDUCTION FOR MARITAL PORTION
Dr. Ogden and LSUHSC also contend that the trial court erred by failing to deduct $400,000.00 from the judgment, this amount being the marital portion the plaintiff is due pursuant to La. C.C. arts. 2432 and 2434.[38] They argue that the prescriptive period of three years to assert a claim for the marital portion from UNO has past and by failing to do so, Ms. Iles has not mitigated her damages.[39]
The record contains testimony that Ms. Iles is in negotiations with UNO concerning her marital portion. We can only assume, as negotiations are on-going, that an agreement may exist between the parties that prescription will not be asserted by UNO. In any event, no evidence exists to support this assignment of error, which we find without merit.

4. DEDUCTION OF PRIOR SETTLEMENT
The lone assignment of error by the plaintiff concerns the trial court's deduction of a prior payment of almost $2.4 million dollars from the principal amount of the judgment rather than the pre-judgment interest accruing since the suit was filed. The money represented the policy limits from Dr. Ogden's personal liability insurer.[40] In support of her position, Ms. Iles relies on La. C.C. art. 1866, which provides:
An obligor of a debt that bears interest may not, without the obligee's consent, impute a payment to principal when interest is due.
A payment made on principal and interest must be imputed first to interest.
The defendants argue that the plaintiff has cited no jurisprudence applying this code article to a settlement that is entered into before trial and a subsequent judgment. Because no judgment existed at the time of the settlement, it cannot be applied to the interest on that judgment.
*454 We find no merit in the plaintiff's position. Article 1866 is found in Chapter 6A of the Civil Code of Obligations dealing with the method of imputing a payment made on outstanding debts. It has no relevance to the situation at hand. We agree that the trial court properly deducted the settlement from the principal amount of the judgment.

CONCLUSION
Based on the forgoing, we amend and correct the judgment to set forth the amounts awarded to Ms. Iles as follows:

 Past Attendant Care $ 350,400.00
 Future Attendant Care $3,943,971.00
 Loss of Past Earned Income $ 53,769.57
 Loss of Future Earned Income $ 122,589.50
 Loss of Past Unearned Income $1,065,434.16
 Loss of Future Unearned Income $4,432,515.00

In all other respects, the judgment is affirmed.
AMENDED IN PART; AFFIRMED AS AMENDED; RENDERED.

ON APPLICATION FOR REHEARING
MAX N. TOBIAS, JR., Judge.
Upon the application for rehearing of this court's opinion dated 26 February 2010 by the defendants/appellants/cross-appellees, American Alternative Insurance Corporation, State of Louisiana, Louisiana Health Services Center, and Roger Ogden, II, the court grants the application in part and denies in part.
In consideration of this court's opinion dated 26 February 2010, the judgment of the trial court is reissued and rendered to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Michelle Iles, and against the defendants, Roger H. Ogden, II, State of Louisiana, Louisiana Health Sciences Center, and American Alternative Insurance Corporation, in the following amounts:

(1) Past attendant care
 (past related benefits) $ 350,400.00
(2) Future attendant care
 (future related benefits) 3,942,971.00
(3) Loss of past earned income 53,769.57
(4) Loss of future earned income 122,589.50
(5) Loss of past unearned income 1,065,434.16
(6) Loss of future unearned income 4,432,515.00
(7) Past medical expenses 31,869.10
(8) Future medical expenses 366,937.00
(9) Funeral expenses 6,660.50
(10) General damages
 (a) Michelle Iles' personal
 injuries 500,000.00
 (b) Michelle Iles' loss of love,
 affection 250,000.00
 (c) Carl Muckley's survival
 action 150,000.00
 ______________
 TOTAL $11,553,145.83

IT IS ORDERED, ADJUDGED AND DECREED that the court recognizes that payments received by Michelle Iles due to the death of Carl Muckley, which must be deducted pursuant to Louisiana Civil Code article 2435, and the court recognizes that the payments were made by Great Northern and Liberty Insurance Companies to Michelle Iles as a result of the personal injury, wrongful death, and survival claims that must be setoff as well for a total of $2,390,916.52. Therefore, $2,390,916.52 has been deducted in a pro-rata fashion from the awards detail and calculated by the court immediately above as set forth below.
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that after the above deductions and pro-rated amounts are subtracted, the judgment is hereby rendered in favor of Michelle Iles in the following amounts:

(1) Past attendant care
 (past related benefits) $ 277,884.94
(2) Future attendant care
 (future related benefits) 3,127,768.58
(3) Loss of past earned income 42,641.99
(4) Loss of future earned income 97,219.69
(5) Loss of past unearned income 844,943.20
(6) Loss of future unearned income 3,515,208.69
(7) Past medical expenses 246,534.94
(8) Future medical expenses 290,999.62
(9) Funeral expenses 5,282.12
(10) General damages
 (a) Michelle Iles' personal injuries 396,525.30
 (b) Michelle Iles' loss of love,
 affection 198,262.65
 (c) Carl Muckley's survival action 118,957.59
 _____________
 TOTAL $9,162,229.31

*455 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is hereby rendered in favor of the plaintiff, Michelle Iles, and the defendants, Roger H. Ogden, II and the State of Louisiana, Louisiana Health Sciences Center, jointly and in solido, in the amount of $5,000,000.00, representing the State of Louisiana's self-insured retention limits under policy # AL20032004.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is hereby rendered in favor of the plaintiff, Michelle Iles, and against the defendants, Roger H. Ogden, II, State of Louisiana, Louisiana Health Sciences Center, and American Alternative Insurance Corporation, for the balance of the judgment in the amount of $4,162,229.31.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the future medical expenses of $290,999.62 and the future related benefits (attendant care) of $3,127,768.58 awarded to the plaintiff, Michelle Iles, shall be paid in accordance with the provisions of Louisiana Revised Statutes 13:5106(b)(3)(c).
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is hereby rendered herein in favor of the plaintiff, Michelle Iles, in the amount of $24,929.15, representing costs as follows:

(1) Expert witness fees:
 a. Dr. Michael Harbour $ 1,500.00
 b. Dr. Edward Shwery 1,500.00
 c. Dr. L.S. Kewalramani 3,575.00
 d. Dr. Robert Voogt 1,500.00
 e. J. Stuart Wood, Ph.D. 2,700.00
 f. Benjamin Woods, CPA 1,500.00
 g. Dr. Mortezma Shamsnia 2,000.00
 h. Dr. Roberta Bell 500.00
(2) Court costs:
 a. Civil District Court-Clerk $ 1,320.00
 b. Orleans Parish Civil Sheriff 6,730.75
(3) Depositions used at trial
 a. Video and transcript of Michael
 Barrow $ 466.35
 b. Video and transcript of Carol Slater 637.05
 __________
 TOTAL $23,929.15

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the above and foregoing judgments in favor of the plaintiff, Michelle Iles, and against the defendants, Roger H. Ogden, II, State of Louisiana, Louisiana Health Sciences Center, and American Alternative Insurance Corporation, totaling $ 9,162,229.31, be awarded together with judicial interest thereon in accordance with Louisiana Revised Statutes 13:5112(C).
The defendants/appellants/cross-appellees assert that this court has failed to follow the jurisprudence as set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989) regarding our duty to perform a de novo review once we found the trial court's decision to be manifestly erroneous/clearly wrong. They assert that the amount that Ms. Iles' award from the trial court for the loss of future unearned income that the trial court set at $20,000,000.00 should have been reduced to is $728,725.85 in accordance with our calculations set forth on page 40 of our original opinion of 26 February 2010. We set the final award at $4,432,515.00. We disagree.
Whereas in our de novo review we are not required to give any deference to the trial court's decision as to quantum once we have determined that the trial court is manifestly erroneous or clearly wrong, neither are we required to completely ignore the trial court's determination and conclusions in their entirety. We are reminded that the trial judge heard each witnesses live and could ascertain the demeanor of each witness, the physical appearance of the plaintiff, the tone of voice of each witness, the manner of testimony of each witness, et cetera. We note that some of our calculations of loss of future unearned income, depending upon discount rate and the dollar amount of the annual loss, could be as much as $5,588,744.72. If one were to find that the loss of passive, unearned *456 income should be calculated the same as is traditionally done for earned income and that the S corporation income should be included in the calculation, then Ms. Iles could likewise argue that our award is low.
Ms Iles' damages are severe and she will have large and continuing expenses for her physical care for the rest of her life. The costs of that care more likely than not will increase with time; the precise rate of inflation in the future is unknown. Concomitantly, determining a precise discount rate is a judgment call.
Within our discretion, we find and again reaffirm that a fair and just award to Ms. Iles for loss of future unearned income is $4,432,515.00. La. C.C.P. art. 2164.
Except as to formally and precisely recasting the trial court's judgment so that a person might execute thereon, we find no merit to the defendants/appellants/cross-appellees' application for rehearing.
REHEARING GRANTED IN PART AND DENIED IN PART; RENDERED.
NOTES
[1] Stephanie Iles, daughter of Ms. Iles, was originally named as a plaintiff in this suit but was removed as a plaintiff prior to trial. She was not a passenger in the vehicle forming the subject of this suit.
[2] See La. R.S. 13:4203, stating that "[l]egal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts."
[3] In referring to Mr. Muckley's and Ms. Iles' income herein, we use the terms "unearned" and "passive" interchangeably, the former being the more accurate and latter more commonly used in describing the nature of the income for taxation purposes. In both cases, the income to which we are referring is income derived primarily from securities (equities, bonds, savings accounts, certificates of deposit, mutual funds, etc.) and property (rental income from real estate, etc.)
[4] Earned income is income derived from one's labor and/or employment.
[5] Ms. Iles' mother and sister also provided attendant care; although they were present for the trial, they did not testify.
[6] This is calculated at $10.00 per hour for 24 hours per day for 365 days per year for three years and 366 days for the leap year. (However, one could reasonably believe that the amount that we have arrived is still excessive because it is probably not reasonable to assume that that Ms. Adams worked 24 hours per day for 365 days per year for more than four years without taking some time off for which she was not compensated.) Nevertheless the record is devoid of evidence on this point.
[7] Since Hurricane Katrina, Ms. Iles and her family have been living in Pensacola, Florida. At the time of trial she was, however, renovating her damaged New Orleans home with plans to return to it.
[8] La. C.C.P. art 927 B states:

B. The court may not supply the objection of prescription, which shall be specially pleaded. The nonjoinder of a party, peremption, res judicata, the failure to disclose a cause of action or a right or interest in the plaintiff to institute the suit, or discharge in bankruptcy, may be noticed by either the trial or appellate court on its own motion.
[Emphasis supplied.]
La. C.C.P. art. 2164 states:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable. [Emphasis supplied.]
La. C.C.P. art. 2129 states:
An assignment of errors is not necessary in any appeal. Where the appellant designates only portions of the record as the record on appeal, he must serve with his designation a concise statement of the points on which he intends to rely, and the appeal shall be limited to those points.
[9] Under the will in effect at the time of Mr. Muckley's death, the plaintiff received $600,000.00 and the University of New Orleans received the remainder of his multimillion-dollar estate.
[10] Michael Barrow, the attorney who drafted the unsigned will testified by deposition. He and Mr. Muckley were lifetime friends; Mr. Muckley was his daughter's godfather. Mr. Muckley told him what he wanted in the will and Mr. Barrow prepared it. Mr. Muckley reviewed the draft and made some modifications. Two weeks before his death, Mr. Barrow gave Mr. Muckley a final draft that Mr. Muckley approved. Mr. Barrow testified that the unsigned will reflected Mr. Muckley's intentions.

We note that Mr. Muckley or Ms. Iles maintained a Texas and/or a Louisiana residence. It is unclear whether Mr. Muckley was domiciled in Louisiana or Texas at the time of his death. The Muckleys' 2001, 2002, and 2003 federal income tax returns gave a Texas address, whereas their 1999 and 2000 federal income tax returns stated a Louisiana address. We note Texas, unlike Louisiana, imposes no state income tax, which could explain the use of the Texas address.
[11] In discussing the concept of "cause of action," we are aware of the extensive and learned discussion of our colleagues on the Louisiana Supreme Court in Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234 (La.1993).
[12] In Gauntlett v. Auto-Owners Insurance Co., 242 Mich.App. 172, 180-81, 617 N.W.2d 735, 739 (2000), the court, relying on a Michigan Supreme Court case, held that a survivor's loss of benefits include more than wages and employment benefits the decedent would have received and may include investment income. Thus, the plaintiff was not precluded from receiving survivor's benefits merely because his mother's contribution to his support came from the interest income on her trust.
[13] The Supreme Court in Fowler v. Roberts, 556 So.2d 1, 4-5 (La.1989), reh. granted on other grounds and original opinion reinstated as supplemented, 556 So.2d 1, 3 (La. 1990), stated:

"The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). The first element is usually a judge question, and the other four are usually jury questions unless reasonable minds could not differ. D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts 83-84 (1989)." [Footnote omitted.]
[14] Cf., our discussion infra.
[15] La. C.C. art. 2338 states:

The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property. [Emphasis supplied.]
La. C.C. art. 2339 states:
The natural and civil fruits of the separate property of a spouse, minerals produced from or attributable to a separate asset, and bonuses, delay rentals, royalties, and shut-in payments arising from mineral leases are community property. Nevertheless, a spouse may reserve them as his separate property as provided in this Article.
A spouse may reserve them as his separate property by a declaration made in an authentic act or in an act under private signature duly acknowledged. A copy of the declaration shall be provided to the other spouse prior to filing of the declaration.
As to the fruits and revenues of immovables, the declaration is effective when a copy is provided to the other spouse and the declaration is filed for registry in the conveyance records of the parish in which the immovable property is located. As to fruits of movables, the declaration is effective when a copy is provided to the other spouse and the declaration is filed for registry in the conveyance records of the parish in which the declarant is domiciled. [Emphasis supplied.]
Article 2369.2 states:
Each spouse owns an undivided one-half interest in former community property and its fruits and products. [Emphasis supplied.]
[16] We assume that the surviving spouse does not inherit the property of the decedent for if so, no loss of income is sustained. But see n. 21 infra.
[17] We recognize that one spouse may be consuming more of the passive, unearned community income derived from one of the spouse's separate property. If the surviving spouse is able to establish by competent evidence that he/she was consuming more than fifty percent of such income, that spouse may be entitled to recover that greater figure. In the case at bar, such competent evidence is absent, so we revert to the presumed fifty-fifty percentage split.
[18] The separate property would include a direct bequest, marital portion, use, usufruct, contract, or other similar sources.
[19] As of 1996, the states permitting claims for loss of inheritance include: Alaska, Arizona, California, Colorado, Delaware, Florida, Illinois, Iowa, Kansas, Missouri, Montana, New Hampshire, New York, Ohio, Oregon, South Carolina, Utah, and Wisconsin. Wrongful Death Damages for Loss of Expectancy of Inheritance from Decedent, 42 ALR 5th 465 (1996).
[20] We are aware of the argument, although we have rejected it, that under our Civil Code and the Louisiana Revised Statutes, Ms. Iles had no cognizable property right or vested property right in the property or income (save at the moment the income became community income) of her late husband's estate and therefore no claim of a loss of income. A right she might have must be grounded in La. C.C. arts. 2315, 2315.1, 2315.2 and/or 2315.4 interpreted such that the articles supersede those codal articles relating to heirs and legatees when read in pari materia.
[21] Mr. Ricou testified that the final tax return for the estate had not been filed because the amount of the estate would depend on the negotiations between the plaintiff and the University of New Orleans.
[22] The exact value on the date of death was $5,445,966.00; the estate had grown to $7,389,110.74 at the time of trial in 2008.
[23] We find nothing that requires that this trust be funded with amounts that Ms. Iles receives from this lawsuit. Sums received by Ms. Iles could be placed in another trust with different provisions.
[24] The creation of this trust also makes both Dr. Wood's and Dr. Boudreaux's calculations discussed elsewhere in this opinion as highly questionable and of little value. Fixed income securities rarely if ever have yields of 11% or 7.82% as Drs. Wood and Boudreaux determined as appropriate to make calculations of future losses.
[25] La. C.C. art. 2432 provides:

When a spouse dies rich in comparison with the surviving spouse, the surviving spouse is entitled to claim the marital portion from the succession of the deceased spouse.
La. C.C. art. 2434 states that the marital portion is one-fourth of the succession in ownership if the deceased dies without children, but in no event shall the amount exceed $1 million.
A discussion of issues relating to the martial portion appears infra.
[26] He asserts that statistical data indicates that approximately 66% of a given amount of consumption is required by the survivor to achieve the same standard of living that he/ she would have had with the decedent.
[27] One might hear that the inflation rate in the United States is and has been in the 10% to 15% range. This range is not borne out by the actual official numbers for the "Consumer Price Index, All Items, All urban wage earners" as published by the United States Department of Labor, Bureau of Labor Statistics. See La. C.E. art. 803(8) and (17). Between 1998 and 2008, the actual numbers for annual inflation in the United States ranged from a high of 3.85% to a low of 1.55%, the average being 2.98%. Thus we give no weight, and the trial court should have given no weight, to the statement of an economist of a range of 10-15% as the actual rate of inflation because of the absence of extensive analysis on point which is absent in this case. See State v. Foret, 628 So.2d 1116 (La.1993); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[28] At this point, we note that the record is devoid of any evidence that Ms. Iles would have invested or the trust discussed above would invest all of the monies that Ms. Iles would receive in equities. Moreover, the assumption amounts to pure speculation unsupported by evidence, making the 11% return assumption meaningless at best or existing somewhere north of the North Pole in accuracy.
[29] See footnote 26 supra.
[30] Beginning in 2030, Dr. Wood no longer subtracted the 34%, representing Mr. Muckley's consumption.
[31] We find these multi-million dollar figures to be incredible and unworthy of belief because if one were to have either amount and invested it at a gross annual return of a mere 1%, the return would greatly exceed the total income that the Muckleys were receiving in the years leading up to and the year of Mr. Muckley's untimely death.
[32] Both experts testified that the reports generated by the other would not withstand peer review.
[33] See the discussion of La. R.S. 9:2127, supra.
[34] We note that Mr. Muckley's return from his separate property never approached $2 million per year, either before or after income taxes.
[35] If we were to use a 100% income figure as Ms. Iles' loss, disregarding her entitlement to but one-half of the income derived from Mr. Muckley's separate property, the numbers would be doubled.
[36] The lower the percentage, the higher the present value will be.
[37] Under certain circumstances not material to this case, it is theoretically possible that the loss of unearned income could exceed the value of the lost estate.
[38] See n. 25 supra.
[39] Pursuant to La. C.C. art. 2436, the right to claim the marital portion prescribes three years from the date of death.
[40] The settlement, representing policy limits, was paid by Dr. Ogden's personal liability insurer. Dr. Ogden remained in the lawsuit because he was also an insured under LSUHSC's policy.